[Cite as *State v. Harris*, 2020-Ohio-4461.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,        :

                             No. 108624

    v.                          :

LOWELL HARRIS,                    :

    Defendant-Appellant.       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 17, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-628118-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt and Carson Strang, Assistant Prosecuting Attorneys, *for appellee.*

James J. Hofelich, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Lowell Harris ("Harris") appeals his convictions for murder, felonious assault, and having weapons while under disability. Because we find sufficient evidence supported the convictions, the

convictions were not against the manifest weight of the evidence, and the trial court did not err in permitting the detective's opinion testimony, we affirm.

I. Procedural History

{¶ 2} On May 7, 2018, Harris was charged in a multiple-count indictment as follows: Count 1 — murder in violation of R.C. 2903.02(A), with one- and three-year firearm specifications; Count 2 — murder in violation of R.C. 2903.02(B), with one- and three-year firearm specifications; Count 3 — felonious assault in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications; Count 4 — grand theft in violation of R.C. 2913.02(A)(1); and Count 5 — having weapons while under disability in violation of R.C. 2923.13(A)(2). The state dismissed Count 4 prior to trial. And the parties stipulated that Harris had a prior felony conviction of violence for purposes of Count 5. The indictment stems from the April 2018 shooting death of Harris's friend with whom he lived, Holly Watkins ("Holly" or "the victim").

{¶ 3} Following a trial, the jury returned a guilty verdict on all counts and the attached specifications. Thereafter, the court held a sentencing hearing. At this time, the state conceded that Counts 1 through 3 merged for sentencing and it elected to proceed with sentencing on Count 1. The court then sentenced Harris to 15 years to life in prison on the murder charge, plus three years on the firearm specification, to be served consecutively. The court also sentenced Harris to 3 years in prison on the charge of having weapons while under disability, to be served concurrently with his sentence in Count 1.

{¶ 4} Harris now appeals his conviction, assigning the following errors for our review: (1) his convictions were not supported by sufficient evidence; (2) his convictions were against the manifest weight of the evidence; and (3) the trial court erred in permitting the opinion testimony of a lay witness in violation of Evid.R. 701. In the interest of judicial economy, we will address the assignments of error out of order.

II. Substantive Facts

{¶ 5} A jury trial commenced on May 2, 2019, during which the following witnesses testified on behalf of the state: (1) Clarence Perry, the victim's nephew; (2) Charles Carter; (3) Sherrai Watkins ("Sherrai"), the victim's daughter; (4) Tiffany Parker, the victim's coworker; (5) Latoya Watkins ("Latoya"), the victim's daughter; (6) Michael Stewart, paramedic; (7) Eric Croft, Cleveland police officer; (8) Tommy Manson, Cleveland police detective; (9) David Borden, Cleveland police detective; (10) Wade Westerfield, U.S. Marshals Service task force officer; (11) Cheryl Schwebs; (12) Anthony Jadud; (13) Denise Walker-McCall; (14) Dr. Andrea McCollom, deputy examiner with the Cuyahoga County Medical Examiner's office; (15) Loundon Hardy, the victim's son; and (16) Curtiss Jones, Cuyahoga County Medical Examiner's trace evidence supervisor. Harris testified on his own behalf.

{¶ 6} Clarence Perry, the victim's nephew, worked with the victim and her son, Kareem, at Larchwood Nursing Home. Perry stated that Kareem has Down syndrome and lives with his mother and Harris (who Perry also

called "Derek").  Perry testified that on April 17, 2018, at 7:00 a.m., he arrived at work to find that Holly had not yet arrived, which was unusual for Holly.  When Kareem arrived at 10:00 a.m. without Holly, Perry became concerned. Perry testified that he and his boss phoned Holly several times but got no answer.  Perry then asked Tiffany Parker to drive him to Holly's house on Emery Avenue.  Kareem gave Perry a key to Holly's house.

{¶ 7} Upon arriving at Holly's house, Perry entered the home just past the door and into the living room and called for Holly, Harris, and their dogs.  When Perry got no response, he went to his grandmother's house, which is one block away.  Perry saw Sherrai and Carter at his grandmother's house, and they all expressed concern over Holly's whereabouts.  Perry and Carter then returned to Holly's house and began calling Holly's name. Perry testified that Carter then knocked on the bedroom door and broke the door in when he received no response.  Perry saw his "auntie laying there," bloody, on the side of the bed. Both men ran out of the house upon seeing Holly.  Perry testified that he saw Sherrai enter the bedroom, and she held her mother and cried.  Perry also saw other family members and Parker enter Holly's bedroom at that time. Perry did not see any firearms in the bedroom, and he testified that he did not remove anything from Holly's room, nor did any of the other family members who entered the room.  Perry stated that Parker called 911.

{¶ 8} Carter, Sherrai's boyfriend, lived one street away from Holly.  Carter testified that Holly lived with her son, Kareem, "three or four dogs"

belonging to Harris, and Harris. Carter stated that Holly owns a jeep, but Harris drove it. When Harris was not driving the jeep, he would park it at the end of the driveway, blocking people from entering.

{¶ 9} Carter testified that Perry came to his house on the morning of April 17, 2018. They both returned to Holly's house where they found no jeep and no dogs. Both Carter and Perry entered the home and called for Holly. When they received no response, Carter phoned Holly. He thought he heard Holly's phone ringing in the bedroom, so he tried to turn the doorknob but it was locked. He then kicked in the bedroom door and found Holly unresponsive on the floor. He did not enter the room past the door but saw Sherrai enter the room from behind him and she "reached down and grabbed her mom and lift[ed] her up and put her in her arms." Carter then walked outside, crying. Carter testified that he did not see any firearms in the room, he did not remove anything from the room, and he did not see anyone remove anything from Holly's bedroom. Carter further testified that he had seen Holly the evening before and she "sounded all right" and did not seem upset.

{¶ 10} Sherrai, the victim's daughter, lived one street away from Holly, with her boyfriend, Carter, and her grandmother. Sherrai testified that she would typically see her mother every day, but since Holly had begun dating Harris, Sherrai stopped going to Holly's home because "everything changed when [Harris] came into the picture." Sherrai testified that Holly began meeting her children at the door, talking to them on the porch. Sherrai also stated that Harris would park the jeep at the end of the driveway so that "nobody can get in." He left

just enough room to get his motorcycle in and out of the driveway. According to Sherrai, Holly also began drinking daily, as opposed to only on weekends or social occasions, and she did not appear to be happy in her relationship with Harris. Sherrai testified that Harris kept guns at the house, but Holly did not like guns or violence.

{¶ 11} Sherrai testified that Holly's son, Kareem, lived with Holly and was dependent upon Holly for his care because he has Down syndrome. Holly and Kareem worked together at the nursing home. Sherrai stated that Holly would wake in the morning, prepare Kareem's clothes and lunch, and leave for work, while Kareem would later take the bus to work.

{¶ 12} Sherrai testified that on the morning of April 17, 2018, she overheard a conversation between Carter and Perry and learned that her mother had not shown up for work. She then became concerned for her mother. Carter, Perry, and Tiffany Parker went to Holly's house to check on Holly. By the time Sherrai got dressed, Carter had returned and was in tears. Sherrai then went to her mother's house where she found her mother on her back with one arm up. She did not move her mother, but she held her in her arms. Sherrai did not see any guns or weapons in Holly's room, and she did not see anyone else in the home until the ambulance arrived and the emergency responders pulled her from her mother's body. Sherrai dropped her cell phone on her mother's body when she held her.

{¶ 13} Tiffany Parker worked with the victim, Carter, and Kareem at the nursing home. Parker testified that on April 17, 2018, she arrived at work approximately 10:15 a.m. and Holly was not there. She "immediately started texting and calling her phone" and got no answer. Parker then drove Carter to Holly's house. Upon arriving, Carter entered the house, called out to Holly "a few times," then returned to the car. Carter asked Parker to drive him to his grandmother's house, which was the next street over. Parker waited in the car while Carter went inside his grandmother's house. Parker testified that shortly thereafter, Carter and another family member exited the house, got into a different vehicle, and headed to Holly's house. Parker followed them to the house.

{¶ 14} Parker testified that by the time she had arrived at Holly's house, she saw Carter and other family members exit the house yelling and crying. After learning that Holly had been killed, Parker asked Carter to take her into the house, where she observed Holly with blood "coming down off her face." Parker testified that she did not see any weapons near Holly, nor did she see anyone exit the house with weapons. After running out of the house, Parker called 911.

{¶ 15} Latoya, one of Holly's children, spoke with Holly the evening before Holly's death. Latoya could tell that Holly had been drinking but stated that she "seemed fine." She stated that Holly did not have a problem with drinking. Latoya testified that she did not have any concerns that Holly might want to harm herself in any way. Latoya also testified that Holly told her she thought Harris was cheating on her with a woman in Atlanta.

{¶ 16} Latoya typically called her mother every morning on the way into work, but on the morning of April 17, 2018, Holly did not answer her call. Later that morning, her sister's boyfriend, Carter, called Latoya, asking her if she had spoken with Holly that morning. When she told him that she had not, Carter advised that he was going to check on Holly. When Carter called back, he was screaming. After speaking with Carter, Latoya threw her phone and began to cry. A co-worker then drove Latoya home, and Latoya drove on to Holly's house. When she arrived, she observed detectives and other family members on the scene.

{¶ 17} Michael Stewart, a paramedic with Cleveland Emergency Medical Service, responded to a call regarding a gunshot on Emery Avenue on April 17, 2018. Upon arriving at the scene, he found the victim "slumped against [the] bed," with a gunshot wound to the neck, "just below the jaw," and "blood spatter" near the victim's body. Stewart testified that the victim's body was cold, no weapon was found, and the room was "disheveled, cluttered." He further stated that there were "a lot of people milling about" and the police eventually ushered the family members into the living room.

{¶ 18} Cleveland police officer Eric Croft responded to the scene on April 17, 2018, where he observed other first responders and distraught family members. Officer Croft secured the scene and looked for evidence. The officer testified that he did not observe any weapons on the scene and did not observe anyone remove a firearm from the home.

{¶ 19} Cleveland police detective Tommy Manson also responded to the scene and collected evidence. He observed forced entry into the bedroom and a female victim lying on her back on the bedroom floor "with a defect under her left jaw." The detective also observed blood spatter on the bed and a sandal with suspected blood that was tucked under the bed. Detective Manson testified that aside from a .22 caliber rifle found leaning against the bed, he did not locate any other weapons. He did not recover any shell casings.

{¶ 20} Cleveland police detective David Borden, who responded to the scene on April 17, 2018, and was assigned to investigate Holly's death, testified concerning his training and experience. He has been a law enforcement officer for 23 years and has been assigned to the homicide unit since 2012. Over the course of his employment with the Cleveland Police Department, he attended multiple training seminars and received extensive firearm training.

{¶ 21} Upon arriving on the scene, Detective Borden observed that other first responders had already secured the crime scene. The detective spoke with the other officers on the scene, gathered information regarding their initial investigation, viewed the crime scene and the victim, and interviewed individuals on the scene. He observed the victim lying on the bedroom floor with a gunshot wound to her left neck and "pool of blood" under her head.

{¶ 22} Detective Borden learned that Harris, a jeep, and dogs were missing from the home. While canvassing the neighborhood, the detective located the missing jeep and ultimately had it towed and processed for evidence. During the

course of his investigation, the detective identified Harris as a suspect and obtained a warrant for his arrest. Detective Borden notified the Ohio Violent Offender Task Force to begin searching for Harris.

{¶ 23} Wade Westerfield, a task force officer for the U.S. Marshals Service, learned through his investigation that Harris was staying at a friend's home on Royalton Road in Columbia Station. And on April 20, 2018, the U.S. Marshals surrounded the home. Before knocking on the door, a female resident exited the house and inquired as to what was going on. When shown a picture of Harris, the woman advised the officers that Harris was inside, in the bathroom. When Harris did not respond to the officers, the officers entered the home and discovered Harris in the bathroom with the door closed. Ultimately, Harris surrendered.

{¶ 24} Cheryl Schwebs lives on Royalton Road in Columbia Station with her husband, Robert. Her husband is a retired master builder and mechanic who builds and repairs motorcycles and has previously worked on Harris's motorcycle. Schwebs testified that on April 17, 2018, Harris came to the Schwebs' home to have his motorcycle fixed and he wanted to help Robert work on it. Harris stayed with the Schwebs until he was apprehended on April 20, 2018. Schwebs observed law enforcement officers surround her house on April 20. She went to the front door before the police forcibly entered the home and she spoke with the officers, confirming that Harris was in the bathroom inside her home.

{¶ 25} Anthony Jadud is an auto mechanic with D&K Automotive, which is located on Bellaire Road in Cleveland. Jadud testified that he noticed a maroon jeep parked in front of the auto shop on Bellaire Road when he arrived for work at approximately 8:15 a.m. the morning of April 17, 2018. He recognized this jeep as belonging to Harris because he had worked on the jeep previously. He testified that he did not believe the jeep was normally parked in that location.

{¶ 26} Denise Walker-McCall grew up with Holly, and in April 2018, Holly lived just behind her. Walker-McCall testified that she did not see Holly's jeep parked on the street when she arrived home from work at about 4:30 p.m. on April 16, 2018, nor did she see it when she went to bed at about 10:15 p.m. She stated that she always looks outside at night before bed "[to] make sure [her] door is locked and everything is okay outside of [her] house." Walker-McCall testified that she was certain the jeep was not in the street when she retired for the evening. She also testified that when she awoke at approximately 7:00 a.m. the next morning and opened her curtains, she saw the jeep on the street. Walker-McCall stated that the maroon jeep is not typically parked on the street in front of her house.

{¶ 27} Dr. Andrea McCollom, deputy medical examiner with the Cuyahoga County Medical Examiner's Office, conducted the autopsy on Holly. Dr. McCollom testified that Holly suffered a gunshot wound to her left neck with an exit wound in her left upper back. She explained that the bullet entered the left side of her neck below the jaw, "transected" the left carotid artery, fractured her

fifth and sixth vertebrae, and "transected" the spinal cord. Dr. McCollom stated that Holly would have been immediately paralyzed by the gunshot and "would not [have been] able to move purposefully" thereafter. Dr. McCollom further testified that the bullet traveled "left to right, toward the back and downward" in Holly's body.

{¶ 28} Dr. McCollom also testified concerning the stippling and fouling that occurs when a gun is fired. She explained that fouling is "soot deposition onto the skin" and occurs when the muzzle of a handgun is within 12 inches from its target. Stippling is "the abrasion made by those unburned gunpowder particles" and occurs when the muzzle of the gun is within 3 feet of the target. Dr. McCollom testified that there was no fouling on Holly's skin, but there was stippling. Thus, Dr. McCollom opined that the muzzle of the handgun was between 12 inches and 3 feet away from Holly when it was fired, stating that "[i]t's closer to 3-feet than it is to 1-foot because they're so far spread apart." The determination of the exact distance is not possible, though, because the gun was not recovered.

{¶ 29} Finally, Dr. McCollom testified that the cause of death was a gunshot wound to the neck "with vascular spinal cord and skeletal injuries," and the manner of death was homicide. Dr. McCollom ruled out suicide for several reasons. She stated that there was no gun near the victim's body or at the scene, nor was there fouling on the victim's skin, which would indicate the gun was close to her body. Dr. McCollom stated that "because there's no fouling or — and the stippling is far away — in order for her to have shot the gun herself, she would have to hold it pretty far away from her body, and it would be impossible for her to do that." On

cross-examination, however, Dr. McCollom conceded that "if [the victim is] holding it, like normal, * * * and it's way far out, it could be possible." Dr. McCollom also ruled out suicide because of the injury sustained, stating that "[u]sually [with] a suicide [it is] a contact wound either to the head or chest or near contact for it to cause death."

{¶ 30} Dr. McCollom also ruled out accidental death because there was insufficient evidence at the scene to make that conclusion. Dr. McCollom noted that Holly's blood alcohol content was .211 at the time of her death, which was more than two times the legal limit.

{¶ 31} Four days after Holly's body was discovered, Harris was apprehended at the home of Cheryl and Robert Schwebs in Columbia Station. Detective Borden testified that Harris was in possession of a "burner" phone, which the detective stated is a prepaid cell phone that Harris had purchased the day after Holly's death. The cell phone was analyzed and, according to the detective, the analysis revealed that Harris had researched California, Illinois, and burner phones on it.

{¶ 32} Detective Borden also interviewed Harris, who provided an explanation for Holly's death. The detective testified that he compared Harris's statement to the crime scene photos and other evidence from the scene. He noted that the photos do not depict blood stains on the bed and it did not "look like anybody was in that bed." When asked about Harris's explanation regarding Holly's location when the gun "discharged," Detective Borden stated as follows: "He said

he was on the bed on his half, which would have been closer to the window, and she was on her half, lying on the bed, which you can see from the photos there's a lot of blood. And if she was shot on the bed, lying on the bed, there would be blood staining on the bed. * * * There's not."

{¶ 33} And when asked about Harris's explanation "for how and who was holding the gun at the time [the gun] 'discharged,'" the detective stated as follows, "Well, he said that she was holding the gun below her head turned around with her thumbs in the trigger, so that would give an upward trajectory of the bullet that was expelled from the gun." Detective Borden explained that "the wound that Holly sustained is not an upward trajectory." He continued:

> If it was truly being held like this (indicating) by Holly, when the gun discharged you would expect the bullet to go up through her neck and come out through the back of her neck or out the back of her head and either go up into the ceiling or continue on until a loss of energy and fell on the floor.
>
> That's not the injury she sustained.
>
> You can see the burn mark. It's at a downward angle and it goes out — comes out the middle of her back, in the back, so the firearm had to be above her.

{¶ 34} Detective Borden further testified that the cell phone recovered from Holly's clothing was also analyzed. The detective stated that the last text messages sent from Holly's phone were to Harris on April 16, 2018. These messages include, "Sorry, can't do this. Say I owe you wish I'm going to pay you, but what about the bitch you sending gifts to?" — sent at 7:22 p.m., and "I'm done," sent at 7:23 p.m.

{¶ 35} Loundon Hardy, Holly's son, was one of the individuals who entered Holly's home the morning of April 17, 2018. He testified that he did not enter past the bedroom door because he was in shock as he watched his sister "holding [his] mom in a pool full of blood." Hardy stated that he did not remove anything from Holly's house that day and he did not see a gun. Hardy also testified that he helped clean his mother's house after Harris was arrested and he threw out Harris's belongings, including a magazine with ammunition, but neither he nor his family members "touched [Holly's] room."

{¶ 36} Curtiss Jones, the trace evidence supervisor with the Cuyahoga County Medical Examiner's Office, performed a trace metal detection test to determine whether Holly had handled a metal object, such as a gun. Jones noted there was "no reaction observed on either hand."

{¶ 37} Jones also conducted a gunshot residue test on Holly to determine whether she had fired a gun, had been in close proximity to a firearm at the time it was fired, or touched a surface containing primer residue. Jones stated that he looks for "gunpowder grains" on a decedent's clothing, which are equivalent to stippling on skin, to determine the muzzle-to-target distance. He found powder grains on Holly's shirt but no fouling. Jones therefore concluded that "[t]he presence of the powder grains and the reaction from the chemical testing * * * is suggestive of an intermediate or closer muzzle-to-target distance," which Jones explained was one to three or four feet away, "maybe out to 5 feet potentially."

{¶ 38} Harris testified on his own behalf. He previously served as a city dog warden, a military police officer in the U.S. Army, club security, and numerous assorted jobs thereafter. Harris was trained in the use of firearms during his military service. Harris had known Holly before his military service and was reunited with her years later, when he returned to Cleveland. According to Harris, Holly allowed Harris to move in with her after his mother died. He described his relationship with Holly as platonic, although they shared a bed. Harris testified that he would sleep on top of the covers and use his own blanket if he was cold. Harris stated that there were other rooms in the house where he could have slept.

{¶ 39} Harris stated that he and Holly had different expectations for their relationship, explaining that he had to repeatedly tell Holly that he was not her boyfriend. Harris reported that Holly "carried a torch all those years" for him, but Harris did not share those feelings. He explained that he was still mourning the death of his previous girlfriend and his mother, and that his living with Holly was temporary and came with "no strings attached." On cross-examination, however, Harris conceded that he told the detectives that he had been dating Holly "for the last couple of years." When asked about the inconsistency, Harris indicated that he simply "went along with what [the detective] implied."

{¶ 40} According to Harris, Holly used to drink alcohol only on weekends but then began drinking every day. And it was Holly's idea that Harris park at the end of her driveway so that family members could not "park the car and disappear." Harris had no interest in getting to know Holly's family members, and

he would retreat to the bedroom when they came over. In response to a question regarding a text wherein Holly sounded upset about a woman in Atlanta, Harris stated that the woman from Atlanta was a friend.

{¶ 41} Harris testified that on the morning of April 16, 2018, he awakened at 4:00 a.m., made lunch, and took care of the dogs. He took Holly to work then caught the 6:12 a.m. bus to his job. When he arrived home after work at approximately 7:30 p.m., Holly was not home. He took care of the dogs, made himself some dinner, and fell asleep in the bedroom.

{¶ 42} Harris stated that he awakened, startled, to Holly "going on and off about other women." He began to get dressed, telling Holly, "I'm leaving. I don't want to do this anymore." He then stated what happened next:

> I felt her weight on the bed and the next thing I hear is the gun cocking, and I turned around and I look over my shoulder. We're sitting on the bed; not laying in the bed, sitting on the bed.

> And I turned around and she's pointing the gun at me. I closed my eyes and I said, "Don't do this. Please don't do this." And then she turns the gun around and points it at herself.

{¶ 43} Harris testified that after a few seconds, Holly turned the gun on herself, holding the gun with both hands, with "her thumbs in the trigger," pointing the gun. Harris explained that he tried to take the gun away, placing his right hand on top of the gun, trying not to "jerk it" or "plane it." He further stated that because the gun was cocked, he attempted to "get [his] hand or [his] thumb near the hammer so it couldn't go off," but Holly then "eased up on her grip," and Harris "had one

hand on [the gun for] a hot second and it went off." He stated that the shell never ejected.

{¶ 44} Harris then testified that he panicked, thinking "they're not going to believe I didn't do this. * * * They're not going to believe me. They're going to think I did something to her." He left the gun on the bed where "it dropped."

{¶ 45} Harris also testified that the first thing he thought about was moving his dogs because he knew he would be arrested. He also had a "hind thought" to move his motorcycle. And he moved the bike to the same place he moved the dogs. After dropping the dogs off, Harris parked the jeep on Brookfield Road, where it was discovered. Harris later made arrangements to get the bike to Robert Schwebs's house. He never thought about Holly's son, Kareem, who was home at the time. And he "left the scene of a horrible crime." He arrived at the Schwebs' home at approximately 10:00 p.m. on Tuesday.

{¶ 46} Harris testified concerning the guns he kept in the home. He admitted that he was not permitted to possess guns due to a prior conviction, but he kept a gun "because of all the activity on the streets." He stated that although he had possession of three guns, he did not own all of them. He had a .38 revolver that he kept in a lock box; a 9 mm handgun; and a .22-caliber pellet gun that belonged to his mother's boyfriend, which he kept next to the bed.

{¶ 47} According to Harris, he kept the loaded 9 mm gun under a pillow in the bedroom, "or in the bed," when he was home and in a lock box when he was not home. However, he also testified that when the grandchildren came over, Holly

would move the gun.  When asked why Holly would need to move the gun if it was in a lockbox, Harris answered, "Because it was not in the lock box. * * * I did keep it in there.  It wasn't in there that particular time."  And on cross-examination, he further stated that he "wasn't sure if it was under the pillows or under the [bed]spread, but it should have been somewhere in that area."

{¶ 48} Harris testified on direct examination that his cell phone was not working because the dogs chewed it.  But during his interview with the detectives, Harris never told the detectives that the phone was not working; rather, he told them only that he threw the phone out the window. When asked on cross-examination regarding the discrepancy, Harris stated that he thought he "clarified that later."  Harris testified that he did not call 911, stating, "[s]he was already dead. * * * I was panicked."

III.  Evid.R. 701

{¶ 49} In his third assignment of error, Harris contends that the trial court erred in allowing Detective Borden to offer expert opinion testimony regarding the "upward trajectory of the bullet."  Harris argues that the trial court erred in admitting this opinion testimony because it did not meet the requirements for lay opinion testimony under Evid.R. 701.

{¶ 50} Evid.R. 701 governs opinion testimony by lay witnesses.  It provides that

> [I]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the

witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 51} To satisfy the first prong of Evid.R. 701, the opinion of the lay witness must be "'one that a rational person would form on the basis of the observed facts.'" *State v. Mulkey*, 98 Ohio App.3d 773, 784, 649 N.E.2d 897 (10th Dist.1994), quoting *Lee v. Baldwin*, 35 Ohio App.3d 47, 49, 519 N.E.2d 662 (1st Dist.1987). And where a law enforcement officer "testified as a lay witness to opinions based on his experience as a police officer, his previous investigations, and his perception of evidence at issue," this first prong is satisfied. *State v. Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 12, citing *State v. Grajales*, 5th Dist. Delaware No. 17CAC030020, 2018-Ohio-1124, ¶ 64.

{¶ 52} The second prong of Evid.R. 701 requires that "the opinion * * * assist the trier of fact in understanding the testimony of the witness or determining a fact in issue." *State v. Sibert*, 98 Ohio App.3d 412, 426, 648 N.E.2d 861 (4th Dist.1994), citing *Lee* at 49. Under this prong, a police officer's opinion testimony may be admissible to explain a fact at issue even when it is based on specialized knowledge. *Walker-Curry* at ¶ 13; *State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 19.

{¶ 53} Under Evid.R. 701, "courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 74, citing *State v. McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737

(2001). And, generally, if testimony is based on an officer's training and experience, related to the officer's personal observations during an investigation, and helpful to determine facts in issue, the testimony is properly admitted as lay testimony under Evid.R. 701. *See Maust* at ¶ 18.

{¶ 54} "Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses." *Grajales*, 5th Dist. Delaware No. 17 CAC 03 0020, 2018-Ohio-1124, at ¶ 60, citing *State v. Harper*, 5th Dist. Licking No. 07 CA 151, 2008-Ohio-6926, ¶ 37, citing *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989). We therefore review a trial court's determination of the admissibility of lay witness opinion testimony for an abuse of discretion. *State v. Allen*, 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9, ¶ 46.

{¶ 55} Here, Detective Borden, who was one of two detectives that interviewed Harris, testified on direct examination concerning his review of the evidence in the case and Harris's statement to the police:

> Question: * * * Did you then review, Detective, the photos in the context of the information provided to you by the defendant?
>
> Answer: Yes.
>
> Question: And what, if any, observations did you make in comparison with the information he provided?
>
> Answer: Well, there's no blood stains on the bed on the mattress on top. Doesn't look like anybody was in that bed to me.

Question: All right. And with respect to the defendant's explanation for how and who was holding the gun at the time it "discharged," how does that relate to the angle of her bullet wound?

Answer: Well, he said that she was holding the gun below her head turned around with her thumbs in the trigger, so that would give an upward trajectory of the bullet that was expelled from the gun. The wound that [the victim] sustained is not an upward trajectory. If it was truly being held like this (indicating) by [the victim], when the gun discharged, you would expect the bullet to go up through her neck and come out through the back of her neck or out the back of her head and either go up into the ceiling or continue on until a loss of energy and [fall] on the floor. That's not the injury she sustained. You can see the burn mark. It's at a downward angle and it goes out — comes out the middle of her back, in the back, so the firearm had to be above her.

{¶ 56} We find this testimony satisfies the first prong of Evid.R. 701. Detective Borden has been a police officer for 23 years and a homicide detective since 2012. Over the course of his employment with the Cleveland Police Department, he attended multiple training seminars and received extensive firearm training. Detective Borden testified that he participates in yearly training with firearms. His testimony noted above related to his investigation of the murder and his interview with Harris. Detective Borden's testimony regarding the trajectory of the bullet was rationally based on his perception of the evidence at issue in the case and particularly addressed the fact that Harris's explanation of the position of the victim did not comport with the evidence.

{¶ 57} We also find the detective's testimony is helpful to a clear understanding of the determination of a fact in issue: the use of a firearm and what

occurs when a firearm is discharged. The detective's testimony therefore satisfies the second prong of Evid.R. 701.

{¶ 58} Moreover, the trial court advised the jury that Detective Borden was not an expert in forensic sciences or pathology; rather, his testimony was based upon his lengthy experience as a police officer. The court then instructed the jury to "determine what weight, if any, to give to his testimony [concerning the trajectory of the bullet]." This instruction did not "bolster" the detective's testimony, as Harris suggests. Rather, the instruction served as an explanation to the jury as to how to consider Detective Borden's testimony concerning the trajectory of the bullet.

{¶ 59} In light of the above, we find the trial court did not abuse its discretion in allowing Detective Borden's opinion testimony concerning the trajectory of the bullet.

{¶ 60} Harris's third assignment of error is overruled

IV. Sufficiency of the Evidence

{¶ 61} In his first assignment of error, Harris generally contends that his convictions are not supported by sufficient evidence. In support, he argues that the only eyewitness to the shooting was Harris, his statement to the detectives was corroborated by forensic evidence, there was no evidence of additional injuries to the victim indicative of a struggle, the victim was intoxicated and therefore lacked fine motor skills, and the medical examiner conceded that it would be possible for someone to hold a gun backwards in front of herself and discharge the gun.

{¶ 62} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 63} Harris was convicted of murder in violation of R.C. 2903.02(A). Under R.C. 2903.02(A), "[n]o person shall purposely cause the death of another[.]" A person acts purposely "when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Purpose," therefore, depends on an intended result. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 72.

{¶ 64} Circumstantial evidence may be used to demonstrate purpose or intent, and therefore, intent may be ascertained from the surrounding facts and circumstances in the case. *State v. Scarton*, 8th Dist. Cuyahoga No. 108474,

2020-Ohio-2952, ¶ 72; *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 80. These facts and circumstances include "'the nature of the instrument used, its tendency to end life if designed for that purpose, and the manner in which any wounds were inflicted'" and "'[a] jury can infer intent to kill by the defendant's use of a firearm, an inherently dangerous instrumentality, the use of which is likely to produce death.'" *State v. Martin*, 8th Dist. Cuyahoga No. 91276, 2009-Ohio-3282, ¶ 23, quoting *State v. Mackey*, 8th Dist. Cuyahoga No. 75300, 1999 Ohio App. LEXIS 5902 (Dec. 9, 1999); *see State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 48 (shooting victim in the face and head from close range during the course of aggravated robbery demonstrated a specific intent to kill).

{¶ 65} Harris was also convicted of murder in violation of R.C. 2903.02(B). Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" Harris was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which is a felony of the second degree. And under R.C. 2903.11(A)(1), "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." R.C. 2901.22(B) provides that a person acts "knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 66} Finally, Harris was convicted of having weapons while under disability. R.C. 2923.13(A)(2) states that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence * * *."

{¶ 67} Upon our review, we find there was ample evidence to support Harris's convictions. Dr. McCollom testified that the cause of death was a gunshot wound to the neck and the manner of death was homicide. She concluded that it was not suicide because the victim sustained an injury to her neck and spine, rather than her head or chest; there was no gun near the victim's body or at the scene; and there was no fouling on the victim's skin, yet there was stippling. Dr. McCollom explained that in order for her to have shot the gun herself, she would have to have held the gun "pretty far away from her body." The evidence shows that the muzzle-to-target distance was somewhere between one and three feet, but "closer to 3-feet." Dr. McCollom also ruled out an accident because the evidence at the scene did not support that conclusion.

{¶ 68} Furthermore, as stated above, no gun was recovered from the scene. Harris testified that he left the gun on the bed where it "dropped," yet every family member who entered Holly's home that morning testified that they did not see a gun nor did they remove any guns. And law enforcement officers were not able to locate a gun on the scene. Additionally, there was no shell casing recovered from the scene.

{¶ 69} The evidence also shows that the bullet traveled "left to right, toward the back and downward" in the victim's body, exiting through her upper back. And as Detective Borden testified, if the victim had been holding the gun in the position described by Harris, that position would have given an upward trajectory of the bullet.

{¶ 70} Regarding Harris's conviction for having weapons while under disability, the record reflects that the parties stipulated that Harris had a prior felony conviction of violence for purposes of this charge. And Harris testified that he knew he was not allowed to have firearms, yet he possessed three firearms.

{¶ 71} On this record, and in viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. We therefore find sufficient evidence to support Harris's convictions.

{¶ 72} Harris's first assignment of error is overruled.

V. Manifest Weight of the Evidence

{¶ 73} In his second assignment of error, Harris contends that his convictions are against the manifest weight of the evidence. Other than reiterating the argument he raises for sufficiency, Harris argues that the jury lost its way by "relying on the emotional and speculative testimony" of the victim's family members. He maintains that most of Holly's family members disliked him, the family acknowledged that Holly had begun to drink too much, and he simply avoided Holly's family members due to their admitted history of drug dealing.

{¶ 74} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. This challenge raises a factual issue:

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The use of the word "manifest" in the standard of review "means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence." *State v. Hernandez*, 8th Dist. Cuyahoga No. 106577, 2018-Ohio-5031, ¶ 20.

{¶ 75} Here, we cannot say the jury lost its way in choosing not to believe Harris's version of the events. The medical examiner determined Holly's death was a homicide, ruling out suicide and accidental death. She opined that based on the absence of fouling and the presence of stippling, the muzzle-to-target distance was closer to three feet, and the victim would have to have held the gun "pretty far away from her body" in order to shoot herself given the evidence. The location of Holly's injuries were not consistent with a suicide. The evidence demonstrated that the bullet traveled downward in the victim's body, which was inconsistent with Harris's version of the shooting. And no gun or shell casing

was recovered from the scene. Family members testified that they did not see a gun at the scene nor did they remove anything from the scene. There is also evidence that the bedroom door was locked and a family member had to break it down to gain access to the victim.

{¶ 76} Moreover, the evidence shows Harris's consciousness of guilt. After the shooting, Harris gathered his dogs, removed them from the home, and arranged for their care. He also removed his motorcycle from the property and arranged to have it repaired by a friend. Finally, he parked Holly's jeep away from the scene, and he absconded to his friend's home until law enforcement discovered him hiding in a bathroom four days later. The jury is free to consider Harris's actions in fleeing from the scene in determining his guilt. *State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (1997), quoting *State v. Eaton*, 19 Ohio St.2d 145, 249 N.E.2d 897 (1969), paragraph six of the syllabus ("Flight from justice * * * may be indicative of a consciousness of guilt."); *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 22 (finding the jury was free to infer consciousness of guilt from the defendant's act of "absconding for four months, immediately after the shooting and until apprehended by law enforcement").

{¶ 77} Finally, as previously stated, Harris had guns in his possession and he knew he was not permitted to have them because of a prior conviction. And the parties stipulated to that prior conviction.

**{¶ 78}** Considering the totality of the evidence, we do not find that this is the exceptional case in which the evidence weighs heavily against the conviction. Harris's second assignment of error is overruled.

**{¶ 79}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN T. GALLAGHER, A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR