[Cite as *State v. Chisolm*, 2023-Ohio-604.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                                      :

    Plaintiff-Appellee,                         :

                                No. 111364

    v.                                              :

DEANDRA DE MARRIO CHISOLM,          :

    Defendant-Appellant.                    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 2, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-658290-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin Karkutt, Assistant Prosecuting Attorney, *for appellee.*

Mary Catherine Corrigan, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Appellant Deandra De Marrio Chisolm ("Chisolm") appeals the trial court's order convicting him of two counts of murder, two counts of felonious assault, and one count of abuse of a corpse. After reviewing the facts of the case and the pertinent law, we affirm.

## I.   Facts and Procedural History

{¶ 2}   This case arose following the shooting death of D.J.   In the early morning hours of March 20, 2021, D.J.'s body was found on the side of the highway with a gunshot wound to the neck.

{¶ 3}   Following a jury trial, Chisolm was found guilty of murder, an unspecified felony in violation of R.C. 2903.02(A) as charged in Count 2 of the indictment; murder, an unspecified felony in violation of R.C. 2903.02(B) as charged in Count 3 of the indictment; felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1) as charged in Count 4 of the indictment; felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(2) as charged in Count 5 of the indictment; and abuse of a corpse, a felony of the fifth degree in violation of R.C. 2927.01(B) as charged in Count 6 of the indictment.   The murder and felonious assault convictions each included a one-year firearm specification pursuant to R.C. 2941.141 and a three-year firearm specification pursuant to R.C. 2941.145.   The jury returned a verdict of not guilty of aggravated murder in violation of R.C. 2903.01(A) as charged in Count 1 of the indictment.

{¶ 4}   All but the abuse of a corpse offense merged for sentencing.   The state elected to sentence on murder in violation of R.C. 2903.02(A).   In addition, the one- and three-year firearm specifications merged, and the state elected to sentence on the three-year specification.

{¶ 5}   The trial court sentenced Chisolm to "3 years on the gun specification to be served prior to and consecutive with 15 years to life" for the

murder conviction and 12 months in prison for the abuse of a corpse conviction. The trial court ordered the sentences to run consecutively for a total prison term of "life with parole eligibility after 19 years."

{¶ 6} It is from this order that Chisolm appeals.

## II. Pertinent Trial Testimony and Evidence

{¶ 7} The state called 20 witnesses and admitted over 200 exhibits into evidence. The following testimony, pertinent to this appeal, was proffered.

### A. Witnesses to the Incidents of March 20, 2021

{¶ 8} On March 19, 2021, D.J. and Chisolm went out to a bar with D.J.'s cousin, Shantail DeVaughn ("DeVaughn"), and a friend of D.J.'s named "Shaniece." The group stayed at the bar for "about an hour" having drinks, playing pool, and listening to music. DeVaughn stated that "[e]verything seem[ed] to be going fine." As the night wound down, DeVaughn left with Shaniece. D.J. and Chisolm left together in D.J.'s Mazda ("the Mazda").

{¶ 9} D.J. and her sister, Celia Thomas ("Thomas") planned to meet each other for an "after hours" on West 150th street. D.J. was supposed to meet Thomas at Thomas's house around midnight. When D.J. did not arrive at Thomas's house, Thomas called her. The first two calls went unanswered. On the third phone call, Chisolm answered D.J.'s phone and explained to Thomas "that somebody followed them from the bar and shot the car up on * * * West 90 on Broadway exit." Chisolm told Thomas that he "got out of the car and * * * shot back at them." Thomas asked

where D.J. had been shot and recalled that Chisolm "got real quiet." Asked if he would call the police until Thomas could get there, Chisolm responded, "No."

{¶ 10} In addition to speaking with Thomas, Chisolm called D.J.'s mother, Cynthia Austin ("Austin"), and told her about the shooting. Austin stated that "Chisolm called me and told me my daughter got shot in the freeway." After telling her that D.J. had been shot, Chisolm told Austin, "'Some guys followed us from the bar, and followed us on the freeway, and [D.J.] rolled down the window and they shot her * * * in the neck.'" Chisolm told Austin that he had called the police.

{¶ 11} D.J.'s aunt, Lamare Talley ("Talley"), testified that Chisolm also called her on the night that D.J. died and told her that D.J. "was shot on the freeway." Chisolm explained to Talley that he and D.J. had been at a bar where a group of guys were "pocket watching" them. When they left the bar, the "dudes was following them, and * * * [Chisolm] told [D.J.] that they was following them, and to roll down his window he was gonna shoot at their car." Chisolm told Talley that D.J. "rolled down the window. First [Chisolm] said he shot at their car first. And then he switched it up and said that he never shot his gun, and they just shot at the car and her head dropped." After that, Chisolm told Talley that "he put the car in neutral and he left [D.J.] * * * [o]n the freeway."

{¶ 12} On the night that D.J. died, D.J.'s 14-year-old son, T.J., was at D.J.'s apartment with D.J.'s friend Richard Woodland ("Woodland"). T.J. testified that Chisolm lived at D.J.'s apartment with her.

{¶ 13} At "around 3:00 in the morning," Chisolm came to the apartment and "was talkin' on the phone." T.J. stated that he noticed D.J. was not with Chisolm; Chisolm told him, "she be up in a minute." According to T.J., Chisolm was at the apartment for approximately four to five minutes.

{¶ 14} Woodland recalled he "let [Chisolm] in" the apartment that evening. Before Chisolm arrived, Chisolm called Woodland from D.J.'s phone. Chisolm told Woodland "[t]hat he needed to get in and he wanted me to let him in." After Woodland let Chisolm into the apartment, Chisolm "was on the phone the whole time."

{¶ 15} Patricia Penn ("Penn") was D.J.'s "best friend." Penn testified that Chisolm contacted her via "text messages" on Facebook the day D.J. died. The message exchange between Penn and Chisolm was admitted into evidence. In the messages, Chisolm told Penn about the shooting and stated that "they followed us. * * * They was parking lot pimpin' watchin' us." Chisolm explained to Penn that D.J. "was driving. We was on 67 and Denison. * * * They pulled up on us [and] shot in [the] car." Penn asked who pushed D.J. out of the car, to which Chisolm responded, "They took the car." The two continued sending messages back and forth. Penn asked again, "Can you please tell me what happened to my friend?" Chisolm responded, "I did this s**t. Traumatic stress. * * * I'm traumatized by keep telling the story." Penn responded, "so you killed my friend?" In response, Chisolm sent a video to Penn with another text saying, "We was having a good a** time." Chisolm eventually told Penn:

I love the f\*\*k outta [D.J.]. That's my fiancée. Like n\*\*\*\*s trying to retaliate for [D.J.] understandable, but I'm not the one who they should be lookin' for. It's two suspects out there that killed my life right in my hands. I'm trying not to feed into it because it's not about — because it's about our love one it's unthinkable for me to do it.

**B. Additional Witnesses**

{¶ 16} Lyzmabeth Rodriguez ("Rodriguez") testified that she knew Chisolm and that the two of them had "been together for about ten years" in an "on and off" relationship. However, in March of 2021 they were not together. At that time, Chisolm did not live with Rodriguez, but he used her address as his place of residence.

{¶ 17} On March 20, 2021, between 1:30 and 2:00 a.m., Rodriguez received a call from Chisolm who was "crying and telling [her] that he was scared, and if [she] could come get him." Rodriguez recalled that she picked Chisolm up around East 55th Street. When she arrived, Chisolm was wearing "dark jeans" and "[a] dark jacket" and "[h]e had two phones." Rodriguez described Chisolm as "frantic" and "crying." When Rodriguez asked what was happening Chisolm responded, "I don't want to talk right now." The two went back to Rodriguez's apartment where Chisolm stayed for the next three days. At some point during that time, Chisolm asked Rodriguez "[t]o see if he had a warrant." On March 24, 2021, Chisolm was arrested at Rodriguez's apartment.

{¶ 18} Robert Euerle ("Euerle") testified that he owns and manages the Parma Armory, which is "a firearms retail shop and shooting range." Euerle testified that Chisolm purchased a "IWI-Israel/IWI-USA * * * Masada 9 ORP"

firearm from the Parma Armory on March 3, 2021, as well as "two boxes of 9mm ammo, 115 grain full metal jacket." The firearm was described as a "pistol."

### C. Police and Forensic Pathology Witnesses

{¶ 19} On March 20, 2021, Detective Eric Strick ("Det. Strick") and Officer Matthew Diffenbacher responded to the scene of I-77 North near the Woodland exit because "There was a body on the shoulder of the highway just before the Woodland exit." Det. Strick identified the victim as D.J. According to Det. Strick, no shell casings were found near the victim's body.

{¶ 20} Police executed search warrants at D.J.'s apartment in East Cleveland and Rodriguez's apartment in Cleveland. Detective Troy Edge ("Det. Edge") testified regarding the search performed at D.J.'s apartment on March 23, 2021. Police collected various pieces of evidence including "a Masada firearm box" for a "Masada * * * four-inch barrel 9mm firearm," several rounds of "CBC 9mm Luger ammunition," a pair of jeans "with small stains" that were "a rust color," and "a white T-shirt with suspected blood" staining. The receipt inside the Masada firearm box states that the firearm was purchased from "Parma Armory Shooting Center."

{¶ 21} Detective Walter Emerick ("Det. Emerick") assisted in executing a search warrant for Rodriguez's apartment on March 24, 2021. Police collected a red iPhone, a black iPhone, a pair of Nike "Air Force 1 black shoes," "a pair of black pants," "a gray hoodie jacket, [and a] shirt" from Rodriguez's apartment. Police determined that the black iPhone belonged to Chisolm and the red iPhone

belonged to D.J. Police could not extract data from D.J.'s phone because it had "been factory reset. So when you powered the phone on, it asked you to set up a new device with this phone."

{¶ 22} On the same day, Detective Shane Bauhof ("Det. Bauhof") responded to a radio call that the Mazda was located on West 11th Street in Tremont. Det. Bauhof "noticed there were cameras on the address across where the car was parked" and "spoke to the resident there and asked them about the vehicle." The resident gave Det. Bauhof access to three videos from a Ring doorbell camera. The videos showed that the Mazda was parked on West 11th Street on March 20, 2021, at 2:10 p.m. but did not show when it arrived there.

{¶ 23} The Mazda was towed to the "Cleveland Division of Police impound unit" where it was examined by Detective Larry Smith ("Det. Smith"). Det. Smith testified that the Mazda had "no damage or defects" on any of its sides nor were there any defects to the windows. Detective Smith claimed that when he examined the Mazda it was "a pretty well decent car, no damage at all." Asked what specifically he was looking for regarding defects, Det. Smith stated that he was "[l]ooking for any defects on the side of the car to see if holes where a gun could have been shot from going in or even out of the vehicle. Defects within the vehicle."

{¶ 24} A search of the interior of the Mazda showed that the "front seat area where the driver would be sitting" had "blood on the floorboard on the doorjamb." Additionally, there was "blood on the steering wheel." According to Det. Smith,

the driver's "door was saturated in blood." No blood was found on the passenger side of the Mazda. No firearms or shell casings were recovered from the Mazda.

{¶ 25} Detective Michael Legg ("Det. Legg") obtained video surveillance that showed the Mazda arriving at the bar at approximately 10:49 p.m. on March 19, 2021, and leaving at 12:04 a.m. on March 20, 2021. Another video showed the Mazda on West 14th Street and Starkweather at 2:58 a.m. on March 20, 2021. That video showed a blue minivan "consistently behind [the] Mazda." According to Det. Legg, when the Mazda got to West 11th Street and Starkweather, the video showed "[t]he black Mazda SUV turning in the corner here, and the blue minivan appearing to be following the SUV." The blue minivan was familiar to police because "[i]t resembled an auto that was parked in the driveway of [Rodriguez's apartment] during the execution of the search warrant." The videos were played in court and admitted into evidence.

{¶ 26} Dr. David Dolinak ("Dr. Dolinak") testified as an expert in forensic pathology. He conducted the autopsy of D.J. The autopsy report was admitted into evidence. Dr. Dolinak reported to the scene where D.J.'s body was found so that he could "better appreciate the circumstances of [her] demise, and also get a better idea of what injuries [she] might have so that the investigation can proceed with that in mind."

{¶ 27} Dr. Dolinak reported that D.J. "had a gunshot wound of her neck. The entrance of the bullet was in the right side of the neck. It was a contact-type gunshot wound" meaning "the end of the gun was actually in contact with the skin

when it was fired." The fact that the gun was pressed against the skin when fired was also demonstrated by the presence of "an abundant amount of grainy black and gray gunpowder soot is in the subcutaneous tissue and skeletal muscle underlying the entrance wound." In other words, "gun powder was forced underneath the skin." The farthest the gun could be from the skin to cause this was "less than an inch."

{¶ 28} After conducting his autopsy, Dr. Dolinak found that D.J.'s manner of death "was a homicide." He made this finding due to "[t]he circumstances of her death, and the nature of the injuries, and the police investigation."

{¶ 29} Dr. Dolinak did not find D.J.'s death to be accidental because of "the circumstances; how the body was found, the missing gun, and the police investigation." Further, given the nature of the gunshot wound, "[a]n accidental shooting, that would seem odd. If a gun is placed right against a person's neck, I don't really see how that would be an accident." Dr. Dolinak was asked whether D.J.'s injuries were consistent with a self-inflicted gunshot wound, and responded, "Yes." However, Dr. Dolinak did not find that D.J.'s death was accidental "because it does not look like an accidental gunshot wound" and "the circumstances wouldn't support that." Dr. Dolinak explained:

> [A]ccidental discharge of firearms don't happen often. But when they do, the unexpected discharge of the gun, the gun is in a lot of different positions around the body. It's not actually pressed against the body part.

{¶ 30} Suicide was excluded because "after this wound was sustained, [D.J. would] be paralyzed and not be able to move. There was no gun at the scene. [D.J.] didn't have any history of depression, or suicidal, or psychiatric problems, and I didn't have any indication that there were any problems that would cause her to end her life."

{¶ 31} Here, because the gun was pressed against D.J.'s neck when it went off, according to Dr. Dolinak's investigation he did not "believe that she shot herself" and found her manner of death to be homicide.

**D. Defense Witness**

{¶ 32} Chisolm testified in his own defense. Chisolm testified to the following events regarding D.J.s death.

{¶ 33} Chisolm drove himself and D.J. to "Henry's [bar] on West 44th" in the Mazda. They arrived at approximately 11 p.m., had drinks, and played pool. They left at approximately 12:15 a.m. and went to another bar on "West 65th and Dennison." D.J. drove when they left the second bar, heading towards downtown Cleveland on I-77. Chisolm recalled having four shots of Hennessy and smoking marijuana that evening. However, he stated he was not intoxicated.

{¶ 34} In the car, Chisolm had a loaded 9mm firearm that he purchased at Parma Armory on his lap as well as D.J.'s cellphone and a bottle of liquor. According to Chisolm, D.J. reached for the liquor bottle and he told her "[n]o" because she was driving. At that point:

She actually reached for the bottle. And I pushed her arm like, no, that's enough, and she grabbed the gun off my lap thinking I was gonna give her the bottle.

D.J. began waiving the gun around in a circle and then "[t]he gun went off. She playin' with the gun and it went off."

{¶ 35} Chisolm stated that when the gun "went off" D.J.'s car was in "one lane * * * turning on the curve." The car did not hit anything because it "instantly stop[ped] because she let her feet off the gas."

{¶ 36} Chisolm called D.J.'s sister because he "really didn't know what to do in that type of situation." He stated that he told D.J.'s sister that D.J. "just got shot." He claimed he did not tell her how that happened. Chisolm also claimed he told her to call the police.

{¶ 37} Chisolm then took D.J.'s car to Tremont and "got a ride" from his friend Melvin who took him to 55th Street. Chisolm claimed that Melvin "took me to East 55th all the way to East Cleveland, and from East Cleveland back to 55th." He stated that Melvin drove him to D.J.'s apartment in East Cleveland after D.J. had been shot. Rodriguez picked him up on Woodland. However, Chisolm later testified that Melvin picked him up from West 14th Street and took him to 55th Street, "[a]nd [Rodriguez] picked me up from 55th. "

{¶ 38} Chisolm claimed that after D.J. shot herself, he put his gun in the glove compartment, which is where it was when he left D.J.'s car in Tremont. He admitted that he lied when he told police he gave the gun to a "tall," "bald,"

"crackhead" "with a mustache" on "25th street." Chisolm claimed he did so because he was scared "of being blamed for this."

{¶ 39} When initially asked on direct examination how D.J.'s body ended up on the side of the road, Chisolm answered, "I guess I pushed her out." Responding to follow-up questions, Chisolm stated he did not know if he pushed her out; he said, "I blacked out at that point."

{¶ 40} During his testimony, Chisolm admitted that he lied to Thomas, Austin, Talley, and Penn when he told them how D.J. was shot. Chisolm admitted that it was not true that a man in a mask was "pocket watching" him and D.J. at the bar and that it was not true that he and D.J. were shot at from another car while they were driving. He claimed he did not tell D.J.'s friends and family what really happened because he "didn't know how they was gonna retaliate, and [he] was scared." Chisolm maintained on the stand that D.J. shot herself accidentally.

{¶ 41} Chisolm also admitted to lying when he told the police that a man in a mask who was "pocket watching" him and D.J and when he told the police that he and D.J. were shot at from another car while they were driving. Chisolm testified that he did not tell the police what really happened because he "was afraid how they'd look at [him] as a black male."

### III. Law and Analysis

{¶ 42} Chisolm raises the following two assignments of error:

The verdict[s] as to Count(s) Two (2) through Five (5) cannot be upheld as the evidence does not prove [Chisolm] guilty beyond a reasonable doubt.

The verdicts as to Count(s) Two (2) through Five (5) were against the manifest weight of the evidence.

### A. Sufficiency

{¶ 43} Chisolm challenges his convictions arguing that the state presented insufficient evidence when it "did not prove the mens rae [sic] as to Count(s) Three (3) to Six (6)." Chisolm goes on to argue the evidence as insufficient to sustain his convictions on Counts 2 through 5 consistent with his assignment of error. Chisolm clarifies on appeal that his conviction for abuse of a corpse is an "uncontested conviction[.]" Accordingly, we review whether the state presented sufficient evidence of the requisite mens rea for Chisolm's convictions for murder, Counts 2 and 3, and felonious assault, Counts 4 and 5.

{¶ 44} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St. 3d 380, 386, N.E.2d 541 (1997). We review de novo whether sufficient evidence on every element of an offense was presented. *State v. Smith*, 167 Ohio St. 3d 220, 2022-Ohio-269, 191 N.E.3d 418, ¶ 5; *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 13.

{¶ 45} "Circumstantial and direct evidence are of equal evidentiary value." *Cleveland v. Turner*, 2019-Ohio-3378, 132 N.E.3d 766, ¶ 35 (8th Dist.),

*discretionary appeal not accepted*, 157 Ohio St.3d 1512, 2019-Ohio-5193, 136 N.E.3d 510, ¶ 35, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. A "conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236 (1988).

### B. Chisolm's Convictions

#### 1. Murder

{¶ 46} Chisolm was found guilty of murder pursuant to R.C. 2903.02(A) and 2903.02(B).

{¶ 47} Murder is defined in R.C. 2903.02(A) in part as follows: "No person shall purposely cause the death of another * * *."

{¶ 48} Murder is defined in R.C. 2903.02(B) as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

#### 2. Felonious Assault

{¶ 49} Chisolm was found guilty of felonious assault pursuant to R.C. 2903.11(A)(1) and (2).

{¶ 50} Felonious assault is defined in R.C. 2903.11(A) in part as follows: "No person shall knowingly do either of the following:"

(1) Cause serious physical harm to another * * *;

(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.

**C. Mens Rea**

{¶ 51} A person acts purposely "when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "'Purpose,' therefore, depends on an intended result." *State v. Harris*, 8th Dist. Cuyahoga No. 108624, 2020-Ohio-4461, ¶ 63, quoting *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 72.

{¶ 52} An offender's purpose or intent may be demonstrated through circumstantial evidence. *State v. Martin*, 8th Dist. Cuyahoga No. 91276, 2009-Ohio-3282, ¶ 23. "The determination of whether an offender had the specific intent to kill is made upon consideration of the facts and circumstances surrounding the crime." *State v. Lucas*, 2020-Ohio-1602, 154 N.E.3d 262, ¶ 71 (8th Dist.), citing *State v. Barrow*, 8th Dist. Cuyahoga No. 101356, 2015-Ohio-525, ¶ 16. In determining whether the offender had the requisite intent, "the nature of the instrument used, the lethality of the instrument, and the manner in which the wound was inflicted" can be considered. *Id.*, citing *State v. Majid*, 8th Dist. Cuyahoga No. 96855, 2012-Ohio-1192, ¶ 23.

> The specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death, coupled with relevant circumstantial evidence. *State v. Searles*, 8th Dist. [Cuyahoga] No. 96549, [2011-Ohio-6275, ¶ 11], citing *State v. Widner*, 69 Ohio St.2d 267, 431

N.E.2d 1025 (1982). "[P]ersons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *State v. Garner*, 74 Ohio St.3d 49, 60, 1995-Ohio-168, 656 N.E.2d 623 (1995). "The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Brown*, 8th Dist. [Cuyahoga] No. 68761, 1996 Ohio App. LEXIS 801, 6 (Feb. 29, 1996).

*Majid* at *id*.

{¶ 53} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

**D. Analysis**

{¶ 54} Chisolm claims on appeal that D.J. shot herself accidentally and that the state "did not present any evidence to speak of as to * * * Chisolm's mens rae [sic]." We disagree.

{¶ 55} The circumstantial evidence presented by the state demonstrates Chisolm's specific intent to kill D.J. and that he knowingly caused her serious bodily injury when he shot her in the neck.

{¶ 56} There is no dispute that D.J. died of a gunshot wound to the neck. Further, Chisolm does not dispute that it was his firearm, which he purchased a few weeks before D.J.'s death that was used to shoot D.J. in the neck. The medical examiner concluded that D.J.'s manner of death was a homicide based upon the circumstances surrounding her death and the nature of the gunshot wound inflicted.

{¶ 57} Based on the evidence presented at trial, the circumstances surrounding D.J.'s death include the weapon used was Chisolm's gun, which is inherently dangerous; Chisolm's gun was pressed up against D.J.'s neck when it was fired; the only other person in the Mazda was Chisolm; Chisolm left D.J.'s body on the side of I-77 and then drove away in the Mazda; Chisolm abandoned the Mazda in another neighborhood; no shell casings or firearms were located near D.J.'s body on the side of the highway or in the Mazda; Chisolm communicated with D.J.'s friend and family shortly after D.J.'s death, telling them that D.J. had been shot by someone who followed them from the bar; Chisolm never called 911; Chisolm called two different friends for rides after he abandoned the Mazda; D.J.'s phone was found at Rodriguez's apartment where Chisolm stayed in the days following the shooting, and D.J.'s phone was factory reset so that no data could be collected; Chisolm admitted he lied to the police and to D.J.'s friend and family on the night of the murder when he told them he and D.J. had been "pocket watched" by unnamed individuals, and when he told them he and D.J. were shot at on the road; and Chisolm also lied when he initially told the police what he had done with his gun following D.J.'s shooting.

{¶ 58} Accordingly, we find that the state presented sufficient evidence, including evidence of mens rea, to sustain Chisolm's convictions for murder and felonious assault. Chisolm's first assignment of error is overruled.

**E. Manifest Weight**

{¶ 59} A challenge to the manifest weight of the evidence "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 60} In his second assignment of error, Chisolm argues that his convictions are against the manifest weight of the evidence because "the state of Ohio's death investigator indicate[d] that the injuries sustained [were] consistent with a self-inflicted injury * * *." We disagree.

{¶ 61} While Dr. Dolinak stated that the shooting could have been consistent with an accident, he determined it was not an accident and ruled D.J.'s death a homicide because of the surrounding circumstances mentioned in our resolution of Chisolm's first assignment of error. *See State v. Perrien*, 2020-Ohio-798, 152 N.E.3d 897, ¶ 79 (8th Dist.) (Finding that a defendant's homicide

conviction was "not against the manifest weight of the evidence merely because the jury rejected the defense's theory that the shooting was an accident and found the state's version of the events to be more believable."). In particular, Dr. Dolinak testified that an accidental shooting "would seem odd. If a gun is placed right against a person's neck, I don't really see how that would be an accident." In addition to Dr. Dolinak ruling D.J.'s death a homicide, the jury also heard Chisolm admit that he lied when he told D.J.'s family a version of events that happened on the evening of D.J.'s death and then told a different version of events on the stand at trial. "'[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 2.

{¶ 62} We find that the jury did not lose its way in resolving the conflicting theories of D.J.'s death based upon the evidence presented at trial and finding Chisolm guilty of D.J.'s murder and felonious assault.

{¶ 63} Chisolm's second assignment of error is overruled.

{¶ 64} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

convictions having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

SEAN C. GALLAGHER, P.J., and
MARY EILEEN KILBANE, J., CONCUR