[Cite as *State v. Price*, 2024-Ohio-5598.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

                                  No. 113540

v.                                      :

KRISTON PRICE,                          :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 27, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672959-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carson Strang, Eben McNair, and Jeffrey Maver, Assistant Prosecuting Attorneys, *for appellee*.

Russell S. Bensing, *for appellant*.

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant, Kriston Price ("Price"), appeals his convictions for voluntary manslaughter with firearm specifications. Upon review, we affirm.

## I.  Facts and Procedural History

{¶ 2} On July 26, 2022, Landon Joseph Rogers ("Rogers") was shot multiple times and killed in a Shaker Heights apartment leased by Price ("the apartment"). Price was arrested after calling 9-1-1 and reporting that he "just had to kill his roommate." In August 2022, a grand jury returned a five-count indictment against Price. Count 1 charged Price with aggravated murder, in violation of R.C. 2903.01(A); Count 2 charged him with murder, in violation of R.C. 2903.02(A); Count 3 charged Price with murder, in violation of R.C. 2903.02(B); Count 4 charged him with felonious assault, a second-degree felony, in violation or R.C. 2903.11(A)(1); and Count 5 charged Price with felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(2). Each count carried one- and three-year firearm specifications. Price pleaded not guilty and filed a notice indicating his intent to offer evidence and argue self-defense. The case proceeded to a jury trial in November 2023. The following evidence was presented in the State's case in chief.

{¶ 3} Between 5:08 p.m., and 5:20 p.m., on July 26, 2022, Price and Rogers exchanged the following text messages:

> ROGERS:  We catching 60 when I see you.  Just letting you know what I'm on cus apparently you think s**t real tender and ima show you.  And I'll be leaving when I'm finished.
>
> PRICE: What's good?
>
> PRICE: Prolly the BBC shirt.  I had nothing washed when I had took Mariah to the 9.  She suggested I borrow a shirt.  I had needed to get it washed.  We can for sure handle it how you wanna handle it.
>
> ROGERS: We sure is!

PRICE: Bet.

(Cleaned up.) Tr. 1046-1048; Exhibit Nos. 651 and 652.

{¶ 4} Nolan Coats ("Coats"), a friend of Price and Rogers, testified that the term "catch 60" means "you are going to fight somebody one-on-one for 60 seconds," "have a fair one-on-one fight," and "be cool after that." *Id.* at 724, 741. Coats agreed that Price and Rogers had "typical roommate [disagreements]" and he spoke to both about their dispute on July 26, 2022. *Id.* at 719-720. Coats explained that Rogers called him earlier in the day, saying he was mad at Price, was probably going to move out, and wanted to fight Price. Coats tried to calm Rogers down and diffuse the situation. Later, at around 8:00 p.m., Coats called Price to talk about why he and Rogers had a problem, help to mediate, and prevent a fight. Coats told Price that Rogers wanted to fight and that he needed to protect himself. Price's reaction was "indifferent." *Id.* at 721. Coats explained: "He did not seem very bothered. He did not have like a big reaction." *Id.* Coats testified that he did not tell Price that Rogers was going to bring a gun and shoot him because he had no reason to believe that. Coats knew that Rogers had a firearm but had no knowledge of Rogers having one at that time of the incident. Coats called Rogers right after his conversation with Price, but did not further communicate with Price. Coats spoke to the police the day after the homicide and told them about his interactions with Price and Rogers the previous day.

{¶ 5} Chagrin Valley Dispatch Center Manager Denise Soke ("Dispatcher Soke") received two calls on July 26, 2022, reporting threats at the apartment

followed by numerous calls regarding a homicide. Shaker Heights Patrol Officer Adam Flynt ("Officer Flynt") and Deputy Johnnaya Norton ("Deputy Norton"), who was working as a patrol officer for the Shaker Heights Police Department at the time, responded to those calls. Three 9-1-1 calls from Price were played for the jury in conjunction with Dispatcher Soke's testimony, while Officer Flynt's and Deputy Norton's body-camera footage were played contemporaneously with their testimony.

{¶ 6} Dispatcher Soke testified that Price first called 9-1-1 around 5:20 p.m., and units were dispatched in response to his call. Price told dispatch that last week his girlfriend borrowed a shirt from his roommate's room and his roommate threatened to return home with a gun. As Price began to provide his phone number, the call ended abruptly. Deputy Norton responded to the apartment after being advised by dispatch that Price wanted to speak with officers regarding an incident that occurred between him and his roommate. No one was waiting for police when Deputy Norton arrived, and she was unable to make contact with Price despite various efforts to do so.

{¶ 7} Dispatcher Soke explained that Price's second 9-1-1 call occurred around 8:52 p.m. and units were again dispatched in response. Price told dispatch that his roommate's shirt is missing and he heard that the roommate is trying to come back with a gun or come back and fight. Price advised he did not know the extent of the situation and was not trying to speak with officers about it but wanted to call to protect himself because he also has a gun. Officer Flynt, Deputy Norton,

and another officer responded to the call and spoke to Price about the disagreement he was having with his roommate. Deputy Norton testified as follows regarding their interaction with Price:

> [THE STATE:] [C]an you please describe, Mr. Price's demeanor during your conversation with him.
>
> [DEPUTY NORTON:] I describe it as nonchalant trying to advise us of some things and just like, hey, I'm giving you guys a heads up, whatever this is, what's going on.
> . . .
>
> He was calm so I would say he was still calm.
>
> [THE STATE:] [D]uring your conversation with Mr. Price what did he indicate to you?
>
> [DEFENSE COUNSEL:] Objection.
>
> THE COURT: That is overruled.
>
> [DEPUTY NORTON:] That him and his roommate got into an argument about a T-shirt or shirt that was missing and that the roommate threatened him some type of way and that the roommate was allowed to come back and have a conversation with him about the things that was missing. And they can talk about it. And that he pretty much wanted to defend himself if something was ever to happen.
>
> [THE STATE:] Did he get into the specifics of what was relayed in this text message?
>
> [DEPUTY NORTON:] No. He just said, he said, like he would — something like he was going to throw blows. I don't know what the terms. I guess fight. That's what I got from it. And that's all it was about. That he heard through third parties about the instance with a gun.
>
> [THE STATE:] And did you ask Mr. Price whether or not you could see this text message?

[DEPUTY NORTON:] Yes, I did.

[THE STATE:] And ultimately did he show you this text message?

[DEPUTY NORTON:] No, he did not.

*Id*. at 691-693.

{¶ 8} Dispatcher Soke testified that Price made a third 9-1-1 call around 10:10 p.m. and units were dispatched to the apartment once again. Price told dispatch that he "just had to kill his roommate" after his roommate came into his room and they "started going at it." Dispatch advised over the radio that Price reportedly shot his roommate, and Officer Flynt and Deputy Norton responded to the call. Dispatcher Soke believed a couple other calls were also made.

{¶ 9} Yue Li ("Li"), a Case Western Reserve University civil engineering professor, lived in an apartment below Price's and was another 9-1-1 caller. Li testified that there was "a lot of noise sometimes" and the "very old" apartment building was "not soundproof at all." *Id*. at 748. Around 10:00 p.m., Li heard "something like a boom" from furniture or a person falling. *Id*. at 750. About two minutes later, Li heard five "very rapid" gunshots coming from the primary bedroom above him. *Id*. at 751. After about two minutes, Li heard two sounds that were either "similar gunshot[s] or two very loud noises." *Id*. at 751-752. In between the five gunshots and the two loud noises, Li didn't hear anything. Li called 9-1-1, told the dispatcher that he heard gunshots "probably from our building," and received a phone call back advising that police were on the way. *Id*. at 752.

{¶ 10} When Deputy Norton arrived on scene, she took cover on the side of the building, waited for additional units to respond, and stood by until dispatch told Price to exit the building. Officer Flynt tactically approached the building with several other officers, ordered Price to exit with his hands up, and secured Price, who told them what happened. Officer Flynt and the other officers then entered the apartment building, cleared the apartment, rendered first aid, processed the scene, and contacted witnesses.

{¶ 11} Shaker Heights Police Officer James Kern ("Officer Kern") and Canine Unit Officer Ante Cacic ("Officer Cacic") were amongst the other officers who received and responded to the homicide call and entered the apartment. Officer Kern's and Officer Cacic's testimony were paired with footage from the body cameras they were wearing at the time.

{¶ 12} When Officer Kern arrived on scene, Price was coming out of the apartment building and was compliant with police orders. When Price was being detained, Officer Kern noticed blood on his hand and Officer Cacic arrived on scene. Officer Cacic established a "go team" to enter the apartment building. Officer Kern was part of the entry team and was tasked with rendering medical aid. As Officer Cacic made his way to the apartment, he noticed that the door of the residence was "wide open" and observed an unresponsive "male laying in the doorway on the door" "in a sitting position." *Id*. at 420, 422. Officer Cacic cleared the apartment to ensure there were no active threats and located a box of ammunition on the table, a handgun laying on a bed, and holes in a bedroom wall. Officer Cacic testified that

the bedroom in which the handgun and bullet holes were located ("primary bedroom") appeared to be in "disarray." *Id.* at 425. After Officer Cacic entered the apartment, he advised the patrol units behind him to render first aid to Rogers.

{¶ 13} Officer Kern also observed the "male figure slumped against the front door unresponsive with blood stains on his shirt." *Id.* at 454-455. Officer Kern cut off Rogers' shirt to treat his injuries, observed gunshot wounds to Rogers' torso and back, applied chest seals to help prevent blood loss, and began chest compressions. Rogers remained unresponsive. Officer Kern noticed two spent shell casings and a live 9 mm round near Rogers' body. After rendering medical aid, Officer Kern followed the ambulance to the hospital, where Rogers was pronounced deceased. Officer Kern then photographed Rogers and his injuries and took receipt of his clothing, which he relinquished to a detective.

{¶ 14} Ohio Bureau of Criminal Investigation Special Agent Daniel Boerner ("Agent Boerner") assisted the Shaker Heights Police Department in their investigation of Rogers' homicide. Hours after the incident, Agent Boerner arrived on scene, received a formal briefing, and performed a walk-through. Agent Boerner then began to process the scene by taking a 360-degree scan of the apartment and took photographs of its interior and exterior. Some of these photos depicted the front door, which did not indicate signs of forced entry; the primary bedroom, where much of the evidence was located, including a broken glass from a mirror that was on top of a dresser; a second bedroom, where clothes, personal hygiene items, bedding, food items, a bookbag, and a television were located; suspected ballistic

impacts in the apartment's front door, primary bedroom's dresser and wall above the dresser, and in the door of a second bedroom; a suspected exit ballistic impact in the second bedroom's wall that adjoins the primary bedroom; and the suspected blood stains throughout the apartment, including on the entryway floor and wall as well as along the hallway floor from the bedrooms to the entryway. Agent Boerner also photographed and collected the following evidence:

1. Two 9 mm cartridge casings and one 9 mm cartridge were located near the apartment's front door;

2. A fired bullet was located in the hallway outside of the primary bedroom;

3. A 9 mm cartridge was located on a dresser in the primary bedroom;

4. A Beretta 92x 9 mm handgun, laptop, ammunition box, and 9 mm cartridge casing were located on the bed in the primary bedroom;

5. An empty gun box, which contained a receipt indicating that Price purchased the Beretta handgun, was located under the bed in the primary bedroom;

6. Four 9 mm cartridge casings and Rogers' keys were located on the primary bedroom's floor;

7. A fired bullet was located in the door of the second bedroom;

8. An ammunition box was located on a hutch in the living room; and

9. Five 9 mm cartridges were located on the stairs outside of the apartment.

During his investigation, Agent Boerner constructed a scaled, overhead diagram of the apartment, indicating where this evidence was located. Agent Boerner indicated

the distance between the primary bedroom and the front door was approximately 22 feet.

{¶ 15} Shaker Heights Police Detective Steven Yung ("Detective Yung") assisted with the investigation, collected swabs for a gunshot residue kit and samples of the suspected dried blood from Price's hands, and interviewed Price with Shaker Heights Police Detective Kurt Falke ("Detective Falke"), the lead detective in this case. Detective Falke was certified in firearms after completing two police academy programs with multiple weeks of firearms training, one in North Carolina, where he worked for a sheriff's department for approximately seven years, and one in Ohio, prior to joining the Shaker Heights Police Department in 2013. Detective Falke was also a certified firearms requalification instructor and processed crime scenes in Ohio.

{¶ 16} Detective Yung testified that he read Price his Miranda rights and Price agreed to speak with them. The detectives interviewed Price twice, once before they responded to the crime scene and once after. Detective Falke did not observe any obvious or apparent injuries on Price during the interviews or in photographs of Price's person and hands that were taken while he was in custody.

{¶ 17} Detective Falke explained that the goal of the first interview was to "just see what Mr. Price had to say to what his — what happened from his point of view." *Id*. at 971. Portions of the video recording of Price's first interview were played for the jury. During the interview, Price advised that he did not have any injuries and explained the events and circumstances surrounding the shooting.

Price told the detectives that he recently moved into the apartment, which was leased in his name only, and Rogers was staying with him. That day, Price received a text from Rogers indicating that he wanted to fight because one of his shirts was missing. Price admitted that he borrowed Rogers' shirt without asking but had every intention of returning it. Price then received a call from Coats, who told him that Rogers was upset, looking for Price, and wanting to fight. Price told Coats that he and Rogers could talk once Rogers got to the apartment.

{¶ 18} Price advised the detectives that he called 9-1-1 to inform police of the dispute; however, his phone died during the call. Price then took a nap before Coats called him again and warned him that he should protect himself. Price called 9-1-1 back to finish advising authorities about the dispute, although he did not believe it was necessary to meet with police to discuss the matter further.

{¶ 19} Price claimed that the apartment door swung open about 15 minutes after the second 9-1-1 call. Rogers entered the primary bedroom and accused Price of stealing his gun and keys and using his social security number. Price stated that he never saw Rogers so angry. Price described the fight that ensued, including Rogers hitting him on the jaw, grabbing and tossing him around, choking him briefly, and pinning him against the dresser. Price said that Rogers did not make threats and wanted to "just fight," but Rogers kept "coming at" and "attacking" him. Price tried to get around Rogers but was unable to do so.

{¶ 20} Price pulled his gun out of his pocket while pinned against the dresser, thinking that if he showed Rogers the gun he would stop. However, Price did not

believe Rogers saw it before he fired the first shot to get Rogers' attention. Price did not know where the first shot went but did not believe Rogers was hit. Rogers "kept going" and became angrier before Price "landed one on him." Price said he felt attacked and had to shoot Rogers because Rogers was in control and he was unable to get away. Price believed he might have fired his gun three or four times, and five at the most, before Rogers began to fall backwards out of the primary bedroom and into the hallway.

{¶ 21} Price picked up his phone and called 9-1-1. Toward the end of the first interview, Price admitted that no one told him that Rogers was going to shoot him; however, Price did not know Rogers' intentions or motives, especially since Coats told him that Rogers was angry and to protect himself. Price also mentioned that Coats told his girlfriend about the dispute. Detective Falke testified that it was his understanding from Price's interview that the altercation took place in the primary bedroom and Price was pressed and held against the dresser before the shooting occurred. Detective Falke indicated that Price did not mention any gunshots occurring outside of the primary bedroom.

{¶ 22} Shortly after Price's first interview, Detective Falke and Detective Yung went to the apartment. Detective Yung explained, "We wanted to [go out to look at the scene] to get a better understanding of the layout of the apartment, kind of validate some of the things Mr. Price told us in the interview and just observe the crime scene." *Id.* at 934. Detective Falke testified that "it was immediately apparent [that] two bullets [were] wedged in the bottom right of the apartment door." *Id.* at

985. Detective Falke also observed shell casings on the floor of the primary bedroom and bullet holes in the wall above the dresser, on the top of the dresser, and in the dresser.

{¶ 23} After returning from the scene, the detectives reminded Price of his rights and asked him if he wanted to continue to speak with them. Price agreed, and a second interview was conducted. Portions of the video recording of Price's second interview were played for the jury. The detectives advised Price that multiple gunshots were fired into and above the dresser and asked Price how he was shooting into and toward the dresser if he was pressed against it. The detectives also questioned Price about the bullet holes in the apartment's front door and the nearby shell casings, advising that it appeared like Price was shooting into Rogers while standing over him. Price was not sure how shots were fired behind him and reiterated that the shooting occurred inside of the primary bedroom, and he never fired his gun outside of it.

{¶ 24} The day after Price's interviews, Detective Yung attended the autopsy of Rogers to determine the cause of death, manner of death, and number of gunshots Rogers sustained. Detective Yung also interviewed contacts and witnesses, collected the white t-shirt and black tank top that Rogers was wearing at the time of the shooting, and extracted the two bullets that were lodged into the bottom right of the apartment's front door. On two later occasions, Detective Falke returned to the scene to take close-up photographs and measurements of the bullet holes in the

apartment's door. Detective Falke testified that no other firearm was ever located in the apartment. Nor was a firearm located on or near the body of Rogers.

{¶ 25} During his direct examination, the State asked whether Detective Falke formed any judgment about the angle at which the bullets struck the apartment's front door. The defense objected, claiming that Detective Falke could not offer his opinion about the trajectory of the bullets because such information was not within the common knowledge of a lay person and amounted to expert testimony. The defense argued that the State was attempting to circumvent the rules governing such testimony and bypass the requirement to provide an expert report. The trial court heard the arguments of both parties outside the presence of the jury and considered evidentiary rules and caselaw before determining that Detective Falke would be permitted to testify about the direction of the bullet impacts. Ultimately, Detective Falke testified that based on his observation of the bullet defects and his training and experience, the bullet impacts appeared to be at a downward angle.

{¶ 26} Cuyahoga County Deputy Medical Examiner David Dolinak, M.D., ("Dr. Dolinak") performed Rogers' autopsy. Dr. Dolinak identified six gunshot wounds to Rogers' body: (1) to the left upper back, exiting his right upper chest and traveling back to front and downward; (2) to the left mid back, exiting his right mid chest and travelling back to front and downward; (3) to the right upper abdomen, existing his right lower back; (4) to the left abdomen, existing his left lower back; (5) to Rogers' right thigh, entering toward the back of his thigh and existing toward the

front; and (6) to his right hand, exiting through his palm. Dr. Dolinak testified that he would expect the gunshot wounds to Rogers' back to be fatal and that the gunshot wound to Rogers' right abdomen "could easily be fatal all by itself." *Id.* at 644. Dr. Dolinak further testified that the gunshot to Rogers' hand occurred from a distance at least two-to-three feet away. Other than these gunshot wounds, Dr. Dolinak did not find any evidence of other injuries and concluded that Rogers died as a result of gunshot wounds.

{¶ 27} Curtiss Jones ("Jones"), Trace Evidence Unit Supervisor for the Cuyahoga County Medical Examiner's Office, collected evidence from Rogers' hands, examined the items of clothing submitted by the Shaker Heights Police Department, and tested a gunshot residue collection kit labelled with Price's name. Jones identified four bullet holes on the fronts of Rogers' black tank top and white t-shirt and three on the back of the t-shirt. Jones believed the back of Rogers' t-shirt had another bullet hole that was cut through. None of the bullet holes appeared to be contact or close-proximity gunshots due to the absence of fouling. However, there was residue "all over" the t-shirt and on the tank top, complicating the interpretation of the evidence. Jones concluded that at least one gunshot had an intermediate muzzle-to-target distance between one to four or five feet. *Id.* at 861-862. Jones further explained:

> The best we can do in terms of this [complex] case or this situation is say at least one [shot] is intermediate, others could be. There's no indication anything else is closer than that. There could be one intermediate, multiple intermediates, could be one intermediate plus a distant, but at least one is intermediate.

*Id.* at 863.  The gunshot residue collection kit labeled with Price's name was tested and indicated the presence of gunshot residue particles.  A gunshot residue sample from both of Rogers' hands was not tested.  Evidence collected from Rogers' hands and clothing was then transferred to the DNA Department for further testing.

{¶ 28} Marissa Esterline ("Esterline"), a forensic scientist from the Cuyahoga County Regional Forensic Science Laboratory's DNA Department, conducted a DNA analysis of the evidence in this case.  Esterline testified that a mixture of blood from Rogers and an unidentified person was collected from Price's left palm.  Price's DNA was matched to the palm and knuckle swab collected from Rogers' left hand.  There was no statistical support for matches between Price's DNA and the samples collected from Rogers' fingernails or t-shirt.  Esterline never tested a handgun for DNA in this case.  However, Sara Dranuski, a firearm examiner from the Firearms Unit of the Cuyahoga County Medical Examiner's Office, tested the collected cartridge casings, fired bullets, and Beretta handgun and concluded that all of the cartridge casings and fired bullets matched and were fired by the handgun.

{¶ 29} After the State rested and the trial court denied Price's Crim.R. 29 motion for acquittal, jury instructions were discussed.  The State stated that it was not objecting to the defense's request for a jury instruction on self-defense and "ha[d] no ground to object to the instruction being given." *Id.* at 1002.  The State further advised that it may be requesting a jury instruction on voluntary manslaughter.

{¶ 30} The defense then called Price as its witness. Price testified that he moved to the apartment in April 2022 and was the only individual on the lease. Price and Rogers were good friends at the time, and Rogers moved into the apartment in May 2022 because he needed a place to stay. However, Price and Rogers' relationship began to immediately deteriorate. The first issue arose when Rogers accused Price of stealing a gun that Rogers carried often, and Price described as being "attached to him." *Id.* at 1140. Next, Rogers' keys went missing and, after Price and Roger were unable to locate them in an initial search of the apartment, Price returned home to the residence being "completely ransacked." *Id.* at 1145. Rogers moved out at the end of May or beginning of June but kept some of his property at the apartment. Rogers returned to the apartment in the beginning of July, would come and go, and still had a key to the residence despite conversations that he no longer lived there.

{¶ 31} On July 26, 2022, Price became aware that Rogers was upset with him after receiving a text, commenting that he wants to "catch 60." Price explained that he knows "catch 60" to mean "an attack or a fight." *Id.* at 1152. Price said that he was "pretty stunned and just stopped in [his] tracks." *Id.* at 1152-1153. Price also testified that when he returned home upon receiving Rogers' text message, his room "had been completely ransacked" and ammunition was "visible and out." *Id.* at 1159-1160. Rogers never expressed hostile intent toward Price to this extreme, and the two were never violent or fought. Price thought that the dispute could be handled however Rogers wanted to handle it.

{¶ 32} Price's girlfriend and Coats also told Price about Rogers' intentions that day. Price's girlfriend was "panicky" and provided alarming information to Price and made him "worried" and "freaked." *Id.* at 1155-1156. Price called 9-1-1 "for their protection" because he "was being threatened both by fighting and also by a gun." *Id.* at 1157. Price explained that he did not speak with police after they came to the apartment because his phone died and he did not have any knowledge of them arriving.

{¶ 33} After Price received additional information from Coats, he called 9-1-1 a second time for protection stating, "I had in mind that police officers would stand by and maybe as [Rogers] grabbed his things so there wouldn't be any violence or any physical altercation as [Rogers] alluded to." *Id.* at 1161. Police officers responded to the call and had a face-to-face discussion with Price. After the police left, Price was "still pretty worried" and planned to leave the apartment because he "didn't want to stay around somewhere [he] was being threatened." *Id.* at 1162-1163.

{¶ 34} Price was in the primary bedroom with the door shut when he heard the front door "being swung open" or "being kicked open." *Id.* at 1165-1166. Price heard "just aggressive just footsteps . . . getting closer" and Rogers calling his name from outside the primary bedroom door in an "aggressive" and "angry" tone. *Id.* at 1167-1168. Price was "very frightened," "just pretty stunned and not knowing what to expect[,] and shaking just a little bit." *Id.* Price testified that he had a loaded gun in his right pocket because Coats told him to protect himself.

**{¶ 35}** Price explained that Rogers kicked the primary bedroom's door open and stumbled into the room "after just using a considerable amount of force to gain entry into the door into the room." *Id.* at 1169. Price testified:

> [PRICE:] He's yelling, he's screaming, he is pacing. His eyes are completely bloodshot. He's just not someone I had — although I've — although I've known him to be [Rogers], it's just not someone I recognize by his demeanor.
>
> [DEFENSE COUNSEL:] Had you ever seen him that upset before?
>
> [PRICE:] No, sir.
>
> [DEFENSE COUNSEL:] And what is the nature of the communication between the two of you at that point in time, if any?
>
> [PRICE:] He's accusing me of stealing his gun, and then his identity, I mean, there are a lot of bizarre comments made. Tell me I'm sweet, I interpret that as I guess weak. He's just instigating and provoking an altercation.
>
> [DEFENSE COUNSEL:] And what is the level of his voice?
>
> [PRICE:] Up kept. Very loud.
>
> [DEFENSE COUNSEL:] And as he is making these comments to you, what is going on in your mind at that point in time?
>
> . . .
>
> [PRICE:] I mean, I'm being confronted at — I mean, your heart starts to race. You — why, and just standing there puzzled and kind of awe and, I mean, I'm just so -- I just get so just tense.

*Id.* at 1170. Price asked Rogers to calm down and explain what was going on, but the confrontation escalated:

> [PRICE:] Standing by the head of my — head of my bed, so nearest the window, my back is to the window, Landon is at the entranceway of my room so he's at the — closer to the foot of the bed, but he's pacing, he's

looking, he's opening drawers, he's screaming, he's yelling, he's got his chest raised, there's veins coming all out of his arms, his fists are pumped, he's clearly instigating a fight. Like I said, I just kept telling him to calm down and saying nothing what was going on in my head was let him just get his aggression out. I thought that that's where that would just end. But then just out of nowhere he punches me and attacks me.

. . .

[DEFENSE COUNSEL:] And where does he punch you, if you recall?

[PRICE:] To the left side of my person . . . .

[DEFENSE COUNSEL:] All right. And after that takes place, what's the next thing you recall?

[PRICE:] Being pushed back to the — I believe there's a radiator in my room. We literally fly back to the radiator and [Rogers] is just all over me in a way that, I mean, I was just smothered.

[DEFENSE COUNSEL:] All right. What happens next?

[PRICE:] We kind of just shimmy, work my way to my feet and I'm choked.

[DEFENSE COUNSEL:] Where are you when you are choked, if you recall? Can you recall where you were when that takes place?

[PRICE:] Yes, sir. I don't like to relive this event but I can recall. I'm against the window in my bedroom, literally against a window.

[DEFENSE COUNSEL:] All right. And once that starts taking place, what's going on in your mind now at this point in time as you are being choked? Tell us your thought process if you can at this point.

[PRICE:] At this point that I'm being attacked, that this is not the person that I had known to be a friend and be a brother to me and I mean someone's hands are around my neck.

[DEFENSE COUNSEL:] How long, if you can, were hands around your neck? Can you give us an estimate?

[PRICE:] The initial time, four seconds, five seconds. Trying to get out of the hold position.

[DEFENSE COUNSEL:] And what do you do at this point in time?

[PRICE:] I attempt to swing to punch him off of me.

[DEFENSE COUNSEL:] And are you successful?

[PRICE:] No, sir.

[DEFENSE COUNSEL:] After you make that swing, tell us happens next.

[PRICE:] So the swing and [Rogers] just, he grabs me. We — there's a — there's two dressers in my room. We're nearest the small one that holds the TV. So we just missed the TV and I just remember landing on the sharp corner of the dresser.

. . .

From there it's just constant punching, constant kicking, constant kneeing to my abdomen area, constant head blows. I mean, just constant.

[DEFENSE COUNSEL:] What do you mean by constant? Repeated? Multiple?

[PRICE:] Repeated, repeated, multiple.

[DEFENSE COUNSEL:] Were you winning this fight or not in your mind?

[PRICE:] No, sir.

[DEFENSE COUNSEL:] All right. Did you make any efforts to get out of your bedroom?

[PRICE:] That's all I wanted to do, yes.

[DEFENSE COUNSEL:] Were you able to get out of your bedroom?

[PRICE:] No, sir.

[DEFENSE COUNSEL:] At what point did you consider using your firearm?

[PRICE:] Not even at that point. Like so we're up against the dresser, I don't know if he is trying to pick me up but we're all around this room at this point. And things are just more rapid, more rapidly growing violent, violent. I had just gained a — just my breath, I just remember just gasping for air. The first time we slammed to the dresser, like [Rogers] had picked me up and like threw me into it, that would have been the first time that I would have thought that I had to use my weapon.

[DEFENSE COUNSEL:] And when did you ultimately use your weapon?

[PRICE:] The first time that I was slammed into the dresser.

[DEFENSE COUNSEL:] And why did you use that weapon? Tell us why you felt it was necessary to use that weapon.

[PRICE:] At this point in time — so I failed to mention that I was also choked again. At this point in time things had just got extremely out of hand and just more violent and not only that but I was wheezing for air and I just wanted it to stop.

[DEFENSE COUNSEL:] Did you give [Rogers] any warning that you had this firearm?

[PRICE:] Verbal warning, no.

[DEFENSE COUNSEL:] Do you know whether or not [Rogers] had a firearm during this whole scuffle you are describing?

[PRICE:] At this point in time, no, I was only told that he was coming back with a gun.

[DEFENSE COUNSEL:] Did you have any thoughts about the safety of the weapon in your own hand?

[PRICE:] Yes, sir.

[DEFENSE COUNSEL:] Describe that for us.

[PRICE:] Throughout this fight Landon had made multiple gestures to disarm me and my person, which it was a fight that was considerably out of control and that was his intentions.

[DEFENSE COUNSEL:] Can you tell us if you recall, when those shots were fired and where you were positioned in that bedroom; do you know?

[PRICE:] Everything happened so quick. I mean, there was — we were in all parts of the bedroom. To best of my recollection I remember the first shot was a warning shot just not intended to even hit [Rogers].

[DEFENSE COUNSEL:] Do you know if that first shot did in fact hit him, or do you not know?

[PRICE:] No, the first shot did not.

[DEFENSE COUNSEL:] Do you know where that first shot went?

[PRICE:] In the heat of the moment, no. But I did aim it like towards the dresser.

[DEFENSE COUNSEL:] And then what about the other shots? How many shots in total did you fire in that bedroom?

[PRICE:] There would have been — so after what I would consider a warning shot that had been taken, there was more just tussle, more being hit, more being grabbed, more my weapon being gestured for. That['s w]hen we were slammed into the dresser and the dresser proceeded to fall over. I mean I was — I got thrown up to the dresser with my back to it and just remember the glass falling, literally cracking over my head. After that I think the dresser had slid and then there was some separation and then [Rogers] advancing at me again and that's just when it happened.

[DEFENSE COUNSEL:] All right. And the next series of shots, why did you shoot [Rogers]? Tell us why.

[PRICE:] Sir, this started as a fight. Felt like I was literally about to die and about to be killed and I was choked. We were stepping on glass at this point. Like [Rogers] would not stop. And just what my body had felt.

[DEFENSE COUNSEL:] All right. After you fired those shots what happens after that?

[PRICE:] I think there were initially two that were fired. And then [Rogers] advancing and I think two more. But things were just pretty immobilized for a moment.

[DEFENSE COUNSEL:] Did [Rogers] stay in your room after those first series of shots?

[PRICE:] He fell backwards within the room so yes, he's still in the room at this point.

. . .

[DEFENSE COUNSEL:] How do you ever exit the bedroom and what happens once you exit the bedroom?

[PRICE:] Well, I just remember my phone being on the charger in the living room. That's where I had left it prior to this altercation and I remember I — after the final shot had been taken, like I proceeded to exit the room but [Rogers], he's right there. And then he's just in a falling position. . . and he proceeds to fall as I'm exiting the bedroom.

. . .

I was grabbed. I was — I mean, really I was grabbed and like, I mean, it was just such a heat of the moment at this point, that's just what I believed.

. . .

I would have expected [Rogers] to stop, like maybe to fall. It's just not what happened. I mean, these gunshots had no effect on [Rogers] whatsoever and we were still in a struggle. We're literally like falling through the living room at this point but I'm just being grabbed as that process is going on.

[DEFENSE COUNSEL:] You're aware that there are two bullets found in your front door, right?

[PRICE:] Yes, sir.

[DEFENSE COUNSEL:] How did those two bullets arrive at that location?

[PRICE:] Still to this day, I mean, I really don't recall shooting. I just recall separating myself from [Rogers] in that position. So he's backwards, I'm forward. And this is where I believe the suspected blood got on my hand is me separating away from [Rogers], us falling into the front door.

[DEFENSE COUNSEL:] Did you fire those two shots at the front door?

[PRICE:] In the struggle, I just — I don't remember doing that.

. . .

[DEFENSE COUNSEL:] At what point were you able to call 9-1-1?

[PRICE:] After us falling at the front door, I run back to my bedroom, I secured my weapon. Well, even before then, because my phone was in the living room at this point in time, I literally run for my phone after what I consider this fight to have either stopped or at least be at a standstill, enough that for the last two to three minutes we had just been in a very violent, just altercation. So what I recall just being, at least a standstill moment, I go for my phone, I secure my firearm, I shut my bedroom door, I lean up against my bedroom door and I call the police.

*Id.* at 1171-1181. Price said he called the police right away, told them what happened, and followed the instructions of the 9-1-1 operator.

{¶ 36} When asked about the statements he made during his interviews regarding his back being against a dresser when the first shots were fired, Price testified, "I mean, like I said, we were all around the bedroom this day. I gave just the best of my recollection." *Id.* at 1182. Price also said he could not provide law enforcement with an explanation regarding the two bullets in the apartment's front door because "I don't remember pulling the trigger on the gun. I remember us — I

remember me fighting myself off of [Rogers] in that area. I just, as we were falling into a door, the gun is in my hand, I just don't really recall still to this day taking those shots." *Id.* at 1184. Price advised that, after being taken into custody, he sought medical treatment the following morning because he was anxious, his ribs were sore, he thought his jaw was broken, his tooth was knocked out, and the bottoms of his feet were cut.

{¶ 37} Price further testified that he believed Rogers had a gun because he was told that he would, ammunition was out of place, and he was being threatened. Price also had knowledge of Rogers using a firearm. While Price did not believe Rogers "actually touched" his firearm that night, he believes that Rogers was fighting for it:

> [PRICE:] Verbally he mentioned it. I mean, that was our fight. That was — I don't know why, but [Rogers] had a — after his gun got stolen, he had a very big interest, a very big passion for my firearm.
>
> [DEFENSE COUNSEL:] Were you going to allow him to get your firearm on that night?
>
> [PRICE:] No, sir.
>
> [DEFENSE COUNSEL:] And why were you afraid of that happening?
>
> [PRICE:] Sir, [Rogers] was in an angry rage, someone I did not recognize, someone that scared the hell out of me. Pardon my French. But that's not the type of person that deserves a firearm in their hands, sir.

*Id.* at 1183. Finally, Price offered testimony regarding his decision to shoot and kill Rogers:

[DEFENSE COUNSEL:] [Price], looking back on the events of July 26th, 2022, do you feel that it was necessary to use that amount of force?

[PRICE:] In the heat of a sudden passion, violent situation, it felt proportional.

[DEFENSE COUNSEL:] And how do you feel today about the loss of your friend Landon?

[PRICE:] It's horrible. Haunts me every day that I'm responsible for ending someone's life. I didn't certainly wake up this day thinking that I would be in this situation. I didn't ever think that I would be in this situation. I mean, it's so horrible for all that's involved, not just me but his family, my family. I mean, someone that I considered to be my best friend and a brother.

*Id.* at 1187-1188.

{¶ 38} Price was then subject to an extensive cross-examination, where he was questioned about the various inconsistencies between his 9-1-1 calls, interviews, and trial testimony, including Price's new claims that he learned from his girlfriend that Rogers was coming to the apartment with a gun, Rogers was no longer permitted to live in the apartment, and Rogers tried to take his gun during the altercation. In light of the "brawl" described during Price's trial testimony, Price was also questioned about his medical records indicating that there was no evidence of injury, the lack of blood or tears on the clothing he wore that evening, and the absence of physical injuries depicted in the photos of Price that were taken while he was in custody.

{¶ 39} During cross-examination, Price admitted that he lied to detectives when he told them that he was not injured. Price also confirmed that he did not tell

detectives about the gunfire or struggle that occurred outside of the primary bedroom. Price stated:

> Well, I was speaking more about where I believe gunshots had went off. In the heat of the moment and the heat of passion I can only recall in the bedroom. But the struggle did lead into the living room. I just don't remember — as we're falling into the front door, I still to this day don't recall shooting because we were there and I just — we were falling into the front door and I would say the peak of — the peak of violence or the peak of that situation, it continued.

*Id.* at 1198. When the State asked whether Price was acting in a sudden passion or out of anger or fear, Price testified that he was "fearful." *Id.* However, when Price revisited the struggle that occurred outside of the primary bedroom, he described the "heat of the moment" and "heat of sudden passion":

> [PRICE:] He's falling. As I attempt to explain, he's falling. So we're coming out of the bedroom. I'm in front of him here because I had like turned around. As he was like — I mean, when you're in a heat of passion, every movement is just — you're trying to process every movement and so I go past him and he like turns and pursues me. But we interlock at the threshold of my apartment, at the threshold where the living room meets the bedroom and I'm grabbed there, another one of my injuries was a big bruise to my arm which was a reflection of that moment. And I'm held, I'm grabbed, and we're toss back in through the bedroom. And not to get too ahead of myself, but we took the same pattern as the blood that was on the floor. You'll see the blood pattern, our exact pattern to the living room. At which point in time I don't know — in the heat of the moment, like his body I think gave at that point in time but we are still locked. And then he falls into the front door. And we both used the welcome mat to slip on and that's where things ended and I ran into my room. I grabbed my phone, I run into the room, I secure the weapon, I locked myself in the room and I called 9-1-1.
>
> [THE STATE:] Why did you stand over him and shoot him twice?
>
> [PRICE:] I didn't do that, sir.

[THE STATE:] Was anybody else there that day?

[PRICE:] No, sir.

[THE STATE:] Well, if you didn't do it and there was nobody else there then who did?

[PRICE:] Well, I'm not denying that I did not do that, sir. But I was not — we were in a position of us falling into a front door with the gun in my hand after we had just — excuse me. Because the fight was not mutual. After [Rogers] had just attacked me. And so that's just where things progressed.

. . .

I'm grabbed and he still just like after me. And then again in the heat of sudden passion, that's — that's what I perceived, I was very uncomfortable, like we had spent all of this time fighting, fight, fight, fighting, fighting, more, more, more, more, it's just like stop, stop, stop, stop, and that is what is happening.
. . .

In the heat of the moment there, to Landon's conduct, [where the shots went is] not what I'm paying attention to at all.

. . .

Again, I just remember like pushing away from [Rogers] and like being in the heat of struggle like when I say all adrenaline pumping, all adrenaline pumping, sir.

Id. at 1200-1201, 1206, 1287. Price further testified that he did not know how many times he shot Rogers in the primary bedroom because they occurred in the "heat of the moment":

Well, in the heat of — like in the heat of the moment of [Rogers] just attacking me, I mean, I really don't know. I was just trying to preserve myself, sir. To put a number on it, I wasn't standing there just counting one, two three, four. I can only in the heat of the moment, sir, it's just not what you are — not what you are doing.

*Id.* at 1247-1248. Price acknowledged that he shot the last two gunshots into Rogers that entered the apartment's front door at a downward angle and that he shot Rogers in the back. Price further testified that he could not see blood on the clothes he was wearing that evening despite the "brawl" he described. Finally, Price admitted that he did not see Rogers with a gun that day and Rogers did not use a gun on him.

{¶ 40} The defense rested, the trial court denied Price's renewed Crim.R. 29 motion for acquittal, and the State dismissed Count 3, murder under R.C. 2903.02(B), and Counts 4 and 5, felonious assault. The parties then provided closing arguments. During its closing argument, the State explained the difference between aggravated murder, murder under R.C. 2903.02(A), and voluntary manslaughter and instructed that "it is important to remember if you find [Price] guilty on the aggravated murder or murder [counts] you do not need to consider voluntary manslaughter." *Id.* at 1317.

{¶ 41} The trial court then provided its charge to the jury. Relevant to this appeal, the trial court provided a limiting instruction regarding Detective Falke's testimony. The trial court stated, "Detective Falke was not an expert in forensic sciences or pathology. Rather his testimony was based upon his lengthy experience as a police officer. It is for you the jury to determine what weight if any to give to his testimony concerning the direction of the bullet." *Id.* at 1379. The trial court also provided instructions on self-defense and the inferior offense of voluntary manslaughter. After the instructions were given, the defense stated that although it was not objecting to the verbiage of the instructions, it was objecting to the inclusion

of the voluntary manslaughter instruction because it was not requested by Price. Based on prior off-the-record discussions, it was the State's understanding "that the objection was coming and . . . [the trial court] was allowing the instruction anyway and that decision was made prior to the jury leaving to deliberate." *Id.* at 1422. The trial court agreed with the State's recollection of events and the defense's objection to any inferior offense instruction being given to the jury.

{¶ 42} Ultimately, the jury returned a guilty verdict for voluntary manslaughter under Counts 1 and 2 of the indictment. Counts 3 through 5 were nolled. Upon agreement of the parties, the trial court merged Counts 1 and 2 for the purpose of sentencing and the State elected to sentence Price on Count 1. The parties further agreed that Count 1's one- and three-year firearm specifications also merged. The trial court sentenced Price as follows:

> Count 1 — 3 years in prison for the firearm specification. Count 1 — 10 years in prison for the underlying offense of voluntary manslaughter. 3-year firearm specification is to run prior to and consecutive to 10 years in prison on the underlying offense for a total of 13 years in prison. Count 1 is subject to Reagan Tokes with a minimum sentence of 13 years in prison and a maximum prison sentence of 18 years in prison. The total stated prison term is 13 years to 18 years at the Lorain Correctional Institution.

(Judgment Entry, Dec. 21, 2023.) Price appealed, raising three assignments of error for review.

## Assignment of Error No. 1

> The trial court erred by instructing the jury on the inferior offense of voluntary manslaughter because there was insufficient evidence of provocation or that [Price] was acting in a sudden rage or passion.

## Assignment of Error No. 2

The trial court erred in entering a conviction of voluntary manslaughter because the manifest weight of the evidence showed that [Price] was acting in self-defense.

## Assignment of Error No. 3

The trial court erred in the admission of evidence.

## II. Law and Analysis

### A. Voluntary Manslaughter Jury Instruction

{¶ 43} In his first assignment of error, Price argues that once the State conceded that a jury instruction on self-defense was necessary, the trial court abused its discretion by also giving an instruction on voluntary manslaughter. Price further claims that there was no evidence to support the voluntary manslaughter instruction.

{¶ 44} It is within the trial court's broad discretion to determine whether the evidence adduced at trial was sufficient to support a requested jury instruction, and its decision will not be disturbed absent an abuse of that discretion. *State v. Singleton*, 2013-Ohio-1440, ¶ 35 (8th Dist.), citing *State v. Fulmer*, 2008-Ohio-936, ¶ 72. A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 45} Voluntary manslaughter, an inferior offense of aggravated murder and murder, requires that a defendant knowingly cause the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is

brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A). This court has held that, in most cases, jury instructions on both self-defense and serious provocation are inconsistent because the mental state of fear, required for self-defense, and passion or rage, required for aggravated assault, are incompatible. *State v. Scales*, 2024-Ohio-2171, ¶ 46 (8th Dist.).

{¶ 46} However, this case is not "most cases" because (1) the self-defense and voluntary manslaughter jury instructions were requested by opposing parties and (2) evidence of both theories was presented during trial through Price's own testimony. Based on our review of the record before us, Price claimed that he was acting in self-defense and requested a self-defense jury instruction accordingly. The State did not object to the defense's request and stated that it may request instruction on voluntary manslaughter. Following these discussions, Price testified in his own defense and claimed that "in the heat of a sudden passion, violent situation, [the amount of force he used against Rogers] felt proportional." During cross-examination, Price stated that he was "fearful" but testified that he shot Rogers in the "heat of the moment" and in the "heat of sudden passion" throughout his testimony. It appears that during subsequent off-the-record discussions the State requested a jury instruction on voluntary manslaughter and, ultimately, the trial court provided the instruction over the defense's objection.

{¶ 47} These unique facts make Price's case clearly distinguishable from those cases where (1) the defense requested an instruction on both self-defense and

voluntary manslaughter, and (2) there was insufficient evidence that the defendant acted with a sudden passion or rage. Because both parties have a right to advance alternate theories of the case, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably when it provided jury instructions on self-defense and voluntary manslaughter. Accordingly, we find that the trial court did not abuse its discretion and Price's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 48} In his second assignment of error, Price argues that the jury's determination that he did not act in self-defense was against the manifest weight of the evidence.

{¶ 49} R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

A self-defense claim under R.C. 2901.05(B)(1) includes three elements:

> "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "'The State's . . . burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal.'" *State v. Nicholson*, 2024-Ohio-604, ¶ 72, quoting *Messenger* at ¶ 27 (holding that "the sufficiency-of-the-evidence standard of review applies to [a defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion").

{¶ 50} In order to evaluate whether a judgment or verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Jordan*, 2023-Ohio-3800, ¶ 17, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), and *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983). The Ohio Supreme Court has repeatedly held that "[a] manifest-weight challenge should be sustained "'only in the exceptional case in which the evidence weighs heavily against the conviction.'"" *Nicholson* at ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175; *State v. Hundley*, 2020-Ohio-3775, ¶ 80.

{¶ 51} Based on our review of the record, we cannot say that this is the exceptional case contemplated by the Ohio Supreme Court or that the jury clearly lost its way in disbelieving Price's testimony. The State presented evidence that

Rogers was shot six times. Notably, two of these gunshots were to Rogers' back and travelled back to front and at a downward angle. The State presented further evidence that none of the shots appeared to be fired while Price's gun was in contact with Rogers or from a close proximity; rather, at least one gunshot had an intermediate muzzle-to-target distance between one to four or five feet. While Price's DNA was matched to the palm and knuckle swabs collected from Rogers' left hand, there was no statistical support for matches between Price's DNA and the samples collected from Rogers' fingernails or t-shirt. Despite hearing "a lot of noise" in the "very old" apartment building and Price's testimony regarding Rogers' ongoing attack, Li testified that he did not hear anything between the five rapid gunshots and two loud noises. Coats also testified that he never told Price that Rogers was bringing a gun to the apartment or that Rogers was going to shoot him. In addition to this evidence, during Price's cross-examination the State highlighted numerous inconsistencies between Price's 9-1-1 calls, interviews, photographs, clothing, medical records, and trial testimony. Based on the record before us, a jury could properly conclude beyond a reasonable doubt that Price did not act in self-defense.

{¶ 52} Accordingly, we decline to find that the jury's rejection of Price's self-defense claim was against the manifest weight of the evidence and his second assignment of error is overruled.

## C. Admission of Detective Falke's Testimony

{¶ 53} In his third assignment of error, Price argues that the trial court abused its discretion when it permitted Detective Falke to testify that the bullets located in the apartment's front door were fired at a downward angle. Price cites no caselaw in support of his argument that Detective Falke's opinion went beyond the scope of Evid.R. 701 and amounted to expert testimony.

{¶ 54} Evid.R. 701 governs opinion testimony offered by lay witnesses and provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness testimony or the determination of a fact in issue." Because the trial courts are afforded "'considerable discretion in controlling the opinion testimony of lay witnesses'" under Evid.R. 701, we review the trial court's determination for an abuse of discretion. *State v. Harris*, 2020-Ohio-4461, ¶ 54 (8th Dist.), quoting *State v. Primeau*, 2012-Ohio-5172, ¶ 74 (8th Dist.), and citing *State v. Allen,* 2010-Ohio-9, ¶ 46 (8th Dist.).

{¶ 55} As discussed by the State, this court previously considered whether a detective was permitted to offer an opinion regarding the trajectory of a bullet in *Harris*. There, we found that the first prong of Evid.R. 701 is satisfied when a law enforcement officer "'testifie[s] as a lay witness to opinions based on his experience as a police officer, his previous investigations, and his perception of the evidence at issue.'" *Id.* at ¶ 51, quoting *State v. Walker-Curry*, 2019-Ohio-147, ¶ 12 (8th Dist.).

We further found that under the second prong of Evid.R. 701, "a police officer's opinion testimony may be admissible to explain a fact at issue even when it is based on specialized knowledge." *Id.* at ¶ 52, citing *Walker-Curry* at ¶ 13, and *State v. Maust*, 2016-Ohio-3171, ¶ 19 (8th Dist.). Thus, we established the general rule that a law enforcement officer's testimony is properly admitted as lay testimony under Evid.R. 701 if the testimony is based on the officer's training and experience, related to the officer's personal observations during an investigation, and helpful to determine facts in issue. *Id.* at ¶ 53.

{¶ 56} The facts of this case mirror those in *Harris*. Here, Detective Falke offered testimony regarding his extensive experience as a law enforcement officer and with firearms training and recertification. Detective Falke stated that he observed the gunshots in the apartment's front door during the investigation when he first visited the apartment and on two other occasions when he returned to the scene to take close-up photographs and measurements of bullet defects. Detective Falke testified that based on his observation of these bullet defects and his training and experience, the bullet impacts appeared to be at a downward angle. Detective Falke's testimony regarding the downward angle of the bullet was rationally based on his perception of the evidence at issue in the case and addressed the fact that Price's recollection of his altercation with Rogers did not comport with the evidence. Detective Falke's testimony was also helpful to a clear understanding of a fact in issue: where and in what direction Price fired his weapon.

{¶ 57} We further note that the trial court charged the jury with same limiting instruction given in *Harris*, 2020-Ohio-4461, ¶ 56-59 (8th Dist.): the trial court advised that Detective Falke was not an expert in forensic sciences or pathology, his testimony was based upon his lengthy experience as a police officer, and it was for them to determine what weight, if any, to give to his testimony concerning the direction of the bullet. Thus, we find, as we did in *Harris*, that Detective Falke's testimony satisfies both prongs of Evid.R. 701 and the trial court did not abuse its discretion in allowing his opinion testimony regarding the direction of the bullet. Accordingly, Price's third assignment of error is overruled.

{¶ 58} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR